# HECKLER, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* TURNER ET AL.

No. 83–1097.   Argued October 9, 1984—Decided February 27, 1985

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Carter G. Phillips* argued the cause for petitioner. On the briefs were *Solicitor General Lee, Acting Assistant Attorney*

General Willard, Deputy Solicitor General Geller, Richard
G. Wilkins, William Kanter, and Richard A. Olderman.
John K. Van De Kamp, Attorney General of California, and
John J. Klee, Jr., Deputy Attorney General, filed a brief for
state respondents, respondents under this Court's Rule 19.6.

Mark N. Aaronson argued the cause for AFDC respond-
ents.   With him on the brief was John E. Peer.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This litigation concerns the proper computation of benefits
to working recipients of Aid to Families with Dependent
Children (AFDC), provided pursuant to subch. IV, pt. A,
of the Social Security Act of 1935 (Act), as amended, 42
U. S. C. § 601 et seq.   Specifically, we must decide whether,
in calculating a household's need, the responsible state agency
is to treat mandatory tax withholdings as a work expense
encompassed within the flat-sum disregard of § 402(a)(8)(A)(ii)
of the Act, 42 U. S. C. § 602(a)(8)(A)(ii), or whether the
agency is to deduct such sums in determining "income" under
§ 402(a)(7)(A) of the Act, 42 U. S. C. § 602(a)(7)(A).   The
latter interpretation, of course, would accrue to the benefit
of the recipient.

I

Before 1981, § 402(a)(7) of the Act required the state
agency responsible for calculating a family's eligibility for
AFDC benefits to "take into consideration any . . . income
and resources of any child . . . claiming aid," as well as any

---

*Kenneth O. Eikenberry, Attorney General, and Charles F. Murphy,
Assistant Attorney General, filed a brief for the State of Washington as
amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the State of
New Mexico by Paul Bardacke, Attorney General, Richard J. Rubin,
and David Stafford; and for the State of New York by Robert Abrams,
Attorney General, R. Scott Greathead, First Assistant Attorney Gen-
eral, Peter H. Schiff, and Judith A. Gordon and Marion R. Buchbinder,
Assistant Attorneys General.

"expenses reasonably attributable to the earning of any such income." See Pub. L. 87–543, § 106(b), 76 Stat. 188 (1962). The Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub. L. 97–35, 95 Stat. 357, however, effected amendments of § 402(a)(7). While preserving the language that instructs the State to consider a family's income and resources, Congress, in § 2302 of OBRA, 95 Stat. 844, eliminated the requirement that the State take into account "expenses reasonably attributable to the earning of any such income." At the same time, by § 2301, 95 Stat. 843, Congress placed in § 402(a)(8)(A)(ii), 42 U. S. C. § 602(a)(8)(A)(ii), a flat $75 "work expense" deduction or "disregard" to be taken from an individual's "earned income."

In response to these amendments, petitioner Secretary of Health and Human Services advised the responsible state agencies that mandatory payroll deductions were to be included in the new $75 work-expense disregard and that this disregard was to be taken from gross rather than net income. The State of California promptly issued regulations implementing these directions;[1] this had the effect of significantly reducing benefits paid to approximately 45,000 California AFDC families with working members.

Respondents, a class of all past, present, and future California AFDC recipients who have been or will be affected by the changes wrought in the AFDC program by OBRA, brought this action in the United States District Court for the Northern District of California to challenge the California regulations implementing the Secretary's directions. They contended that the regulations misconstrued the term "income" in § 402(a)(7) to mean gross income, and thereby incorrectly relegated mandatory payroll deductions to the work expenses covered by the flat-sum disregard of § 402(a)(8); instead, according to respondents, they were entitled to have these mandatory payroll items disregarded by the State when

---

[1] California Department of Social Services, Manual of Policy and Procedure, Eligibility and Assistance Standards § 44–113.21 (Nov. 1981).

calculating income and resources under § 402(a)(7). The State of California brought the Secretary into the litigation as a third-party defendant.

The District Court agreed with the plaintiff class. It therefore granted respondents' motion for summary judgment, as well as the State's motion for summary judgment against the Secretary. The court enjoined the State from implementing its new regulations and the Secretary from terminating federal matching funds due the State. *Turner* v. *Woods*, 559 F. Supp. 603 (1982).

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed. *Turner* v. *Prod*, 707 F. 2d 1109 (1983). Finding the statutory language unhelpful, it scrutinized the legislative history and the administrative interpretation of the two statutory provisions before relying primarily on "congressional purpose" to conclude that § 402(a)(7) "income" had always been net income after deduction of amounts mandatorily withheld for payment of social security, federal, state, and local taxes. Therefore, it concluded, the substitution of the flat-sum disregard of § 402(a)(8) for the work-expense disregard of § 402(a)(7) had had no effect on the independent deduction of tax withholdings in determining need.

The other Courts of Appeals to address the issue have concluded that Congress intended the flat work-expense disregard of § 402(a)(8) to encompass mandatory payroll withholdings, and that "income" for purposes of § 402(a)(7) was gross income.[2] We granted certiorari to resolve the conflict. 465 U. S. 1064 (1984). On July 19, 1984, after the writ had issued but before this Court heard oral argument, the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, became law. This new legislation includes a provision, § 2625(a),

---

[2] See *Dickenson* v. *Petit*, 728 F. 2d 23 (CA1 1984), cert. pending, No. 83–6769; *James* v. *O'Bannon*, 715 F. 2d 794 (CA3 1983), cert. pending *sub nom. James* v. *Cohen*, No. 83–6168; *Bell* v. *Massinga*, 721 F. 2d 131 (CA4 1983), cert. pending, No. 83–6269.

98 Stat. 1135, that directly addresses the issue raised by this case. On the basis of that congressional action, JUSTICE REHNQUIST, in his capacity as Circuit Justice for the Ninth Circuit, prospectively stayed the injunction from July 18, 1984. 468 U. S. 1305 (1984) (in chambers). We now reverse the judgment of the Court of Appeals.

## II

"The AFDC program is based on a scheme of cooperative federalism." *King* v. *Smith*, 392 U. S. 309, 316 (1968). Established by Title IV of the Social Security Act of 1935, 49 Stat. 627, "to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them," *Shea* v. *Vialpando*, 416 U. S. 251, 253 (1974), the federal program reimburses each State which chooses to participate with a percentage of the funds it expends. § 403, 42 U. S. C. § 603. In return, the State must administer its assistance program pursuant to a state plan that conforms to applicable federal statutes and regulations. § 402, 42 U. S. C. § 602. Among these provisions are the two relevant here—§ 402(a)(7), which requires consideration of "income" for purposes of determining need, and § 402(a)(8), which requires the State to disregard certain sums from a recipient's income in making that determination.[3]

---

[3] The State, however, is afforded "broad discretion in determining both the standard of need and the level of benefits." *Shea* v. *Vialpando*, 416 U. S. 251, 253 (1974); see *King* v. *Smith*, 392 U. S. 309, 318–319 (1968). The state plan first establishes the statewide standard of need, "which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level," *Shea* v. *Vialpando*, 416 U. S., at 253, and then determines "how much assistance will be given, that is, what 'level of benefits' will be paid," *Rosado* v. *Wyman*, 397 U. S. 397, 408 (1970). Both eligibility and benefit amounts are determined by comparing income with the state standard of need. If a family's income "is less than the predetermined statewide standard of need, the applicant is eligible for participation in the program and the amount of the assistance payments will be based upon that difference." *Shea* v. *Vialpando*, 416 U. S., at 254. A State need not pay the entire difference, but instead may establish dollar maxima

The present controversy has its roots in a series of amendments to these two sections. As originally enacted in 1935, the Act did not expressly require a State to decrease AFDC grants to families with other income sources. Effective July 1, 1941, however, Congress added § 402(a)(7), which mandated that a state agency, in determining need, shall "take into consideration any . . . income and resources of any child claiming aid to dependent children." Social Security Act Amendments of 1939, § 401(b), 53 Stat. 1379.

This amendment, in its turn, created a new problem. Because "families with working members incurred certain employment-related expenses that reduced available income but were not taken into account by the States in determining eligibility for AFDC assistance," the Social Security Board soon "recognized that a failure to consider work-related expenses could result in a disincentive to seek or retain employment." *Shea* v. *Vialpando*, 416 U. S., at 259. To avoid defeating the purpose of the Act to encourage employment even where it did not wholly eliminate the need for public assistance, *ibid.;* see § 401, 42 U. S. C. § 601, the Board encouraged the State, in determining a family's need, to take account of the additional incidental expenses encountered by a working person.[4]

In 1962, Congress converted this administrative prompting into a statutory requirement. It amended § 402(a)(7) to

or provide only a specified percentage of the family's need. See *Rosado* v. *Wyman*, 397 U. S., at 408–409.

The State of California, a respondent here under this Courts' Rule 19.6, has filed, with others, a brief in support of the petitioner.

[4] See App. 24, 25, Bureau of Public Assistance, Federal Security Agency, Social Security Board, State Letter No. 4 (Apr. 30, 1942) ("It should be recognized that when a person is working there may be additional needs which must be met such as additional clothing, transportation, food and the like"); App. 27, 28, Department of Health, Education, and Welfare, Social Security Administration, State Letter No. 291 (Mar. 11, 1957), incorporated as § 3140 of pt. IV of Handbook of Public Assistance Administration (1957). See also App. 37, Handbook of Public Assistance Administration, pt. IV, § 3140 (1962).

oblige the State to consider, in addition to "income and resources," all "expenses reasonably attributable to the earning of any such income." Public Welfare Amendments of 1962, Pub. L. 87–543, § 106(b), 76 Stat. 188. The amendment made "mandatory the widespread but then optional practice of deducting employment expenses from total income in determining eligibility for assistance." *Shea* v. *Vialpando*, 416 U. S., at 260.

The statute again was amended, effective July 1, 1969, to alter fundamentally the statutory treatment of earned income. Social Security Amendments of 1967, Pub. L. 90–248, § 202(b), 81 Stat. 881. Instead of merely protecting against the possibility of a disincentive, Congress moved to create an affirmative incentive to employment by adding several new deductions, or earned-income disregards. While it left intact the language of § 402(a)(7), requiring the State to take into account both a family's "income and resources" and "any expenses reasonably attributable to the earning of any such income," the amended version subjected this requirement to a new provision, § 402(a)(8). In part, the new section required the State, in computing income for purposes of determining need, to disregard the first $30 of "earned income" in any month, "plus one-third of the remainder of such income for such month." 81 Stat. 881.[5] The effect, of course, was

---

[5] The statute at that time thus had come to be worded as follows:
"A state plan for aid and services to needy families with children must

. . . . .

"(7) except as may be otherwise provided in clause (8), provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, . . . as well as any expenses reasonably attributable to the earning of any such income; (8) provide that, in making the determination under clause (7), the State agency—

"(A) shall with respect to any month disregard—

. . . . .

"(ii) in the case of earned income of a dependent child [or] a relative receiving such aid . . . , the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month . . . ."

to decrease the amount of "earned income" and thereby to increase a family's benefits.

In response to the new section, the Department of Health, Education, and Welfare, which, as successor to the Social Security Board and predecessor of the Department of Health and Human Services, was then administering the AFDC program, issued regulations defining "earned income" for purposes of § 402(a)(8), and incorporating the new disregards into the benefit calculations. "Earned income" was defined as the "total amount" of "commissions, wages, or salary," and calculated "irrespective of personal expenses, such as income-tax deductions. . . ." 45 CFR § 233.20(a)(6)(iv) (1970).

In 1981, by OBRA, Congress again significantly altered the treatment of work expenses. As noted above, in place of the requirement of § 402(a)(7) that the State consider expenses "reasonably attributable" to the earning of income, Congress substituted in § 402(a)(8) a child-care disregard of up to $160, and a flat $75 disregard, "in lieu of itemized work expenses." S. Rep. No. 97–139, p. 435 (1981). In addition, Congress restricted the "$30 plus one-third" disregard to the first four months of a recipient's employment, § 402(a)(8)(B)(ii)(II), 42 U. S. C. § 602(a)(8)(B)(ii)(II), and reduced its impact by requiring that the calculation be made after the work-expense and child-care disregards had been subtracted, § 402(a)(8)(A)(iv), 42 U. S. C. § 602(a)(8)(A)(iv).[6]

---

[6] The statute thus provided:

"A state plan for aid and services to needy families with children must . . .

"(7) except as may be otherwise provided in paragraph (8) . . . , provide that the State agency—

"(A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children . . .

.          .          .          .          .

"(8)(A) provide that, with respect to any month, in making the determination under paragraph (7), the State agency—

.          .          .          .          .

## III

## A

In determining how Congress intended these tandem provisions to operate, we look first, as always, to the language of the statute. *North Dakota* v. *United States,* 460 U. S. 300, 312 (1983). We do not find this language, as informed by the structure and pattern of amendment of the relevant provisions, as unhelpful as did the Court of Appeals.

---

"(ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children, or of any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, the first $75 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month);

"(iii) shall disregard from the earned income of any child, relative, or other individual specified in clause (ii), an amount equal to expenditures for care in such month for a dependent child . . . receiving aid to families with dependent children and requiring such care for such month, to the extent that such amount (for each such dependent child . . .) does not exceed $160 (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month);

"(iv) shall disregard from the earned income of any child or relative receiving aid to families with dependent children . . . an amount equal to the first $30 of the total of such earned income not disregarded under any other clause of this subparagraph plus one-third of the remainder thereof . . . ; and

. . . . .

"(B) provide that (with respect to any month) the State agency—

. . . . .

"(ii) . . .

. . . . .

"(II) in the case of the earned income of a person with respect to whom subparagraph (A)(iv) has been applied for four consecutive months, shall not apply the provisions of subparagraph (A)(iv) for so long as he continues to receive aid under the plan and shall not apply such provisions to any month thereafter until the expiration of an additional period of twelve consecutive months during which he is not a recipient of such aid."

The statute makes no explicit provision for the deduction of mandatory payroll-tax withholdings. Nor does it qualify the meaning of "income" for purposes of § 402(a)(7). Instead, that section provides that, "except as may be otherwise provided in" § 402(a)(8), the state agency's determination of need must take account of "any other income and resources" of an AFDC recipient. Section 402(a)(8), in turn, requires that specified amounts of a recipient's "earned income" be disregarded "in making the determination" under § 402(a)(7). Successive paragraphs of the statute, then, employ twin usages of the term "income"—the first expressly unqualified, the second limited to that "earned." Absent contrary indications, it seems to us to make sense to read "earned income" to represent a subset of the broader term "income." Since those portions of one's salary or wages withheld to meet tax obligations are nonetheless "earned," a common-sense meaning of "earned income" would include tax withholdings. Such an interpretation is reflected, in any event, in the Secretary's longstanding definition of the term as "the total amount [of commissions, wages, or salary], irrespective of personal expenses, such as income-tax deductions." 45 CFR § 233.20(a)(6)(iv) (1984).[7] The OBRA Congress must have had that definition in mind when it re-employed the term in § 402(a)(8). Since earned income includes mandatory tax withholdings, so too does the broader category of "income." Thus, the calculation of need must include all income, unless the recipient has earned income. In that event, the recipient gets the benefit of the disregards of § 402(a)(8). Any authorization for the deduction from § 402(a)(7) income of a working recipient's tax liabilities, even if mandatorily withheld from pay, must be found in the earned-income disregards of § 402(a)(8).

Among those disregards is the flat sum of $75 monthly. § 402(a)(8)(A)(ii). As the congressional Reports accompany-

---

[7] The current version of this regulation is identical to that originally promulgated in 1970.

ing the 1981 amendments make clear, Congress provided this flat sum "in lieu of itemized work expenses." S. Rep. No. 97–139, p. 435 (1981); H. R. Conf. Rep. No. 97–208, p. 979 (1981). The substitution is apparent, as well, from the simultaneous elimination from § 402(a)(7) of the language requiring States to consider "expenses reasonably attributable to the earning of . . . income." Tax liabilities indisputably are so attributable. Indeed, they are the paradigmatic work expense: while transportation, food, clothing, and the like often are susceptible to economies, the proverbial certainty attaches to taxes. Further, the new version of § 402(a)(8) provides a separate disregard, up to $160 monthly, for child-care expenditures, another species of work expense. In contrast, the absence of a special provision conferring independent authorization to disregard mandatory tax withholdings indicates that they were thought to come within the flat deduction. In sum, there is no support in language or structure for any inference that, notwithstanding the unqualified benchmark of "any other income" in § 402(a)(7) and the specified earned-income disregards of § 402(a)(8), Congress contemplated an additional but unmentioned deduction for tax liabilities.

The administrative background against which the OBRA Congress worked also supports the conclusion that mandatory tax withholdings were among the items Congress intended to include within the flat-sum disregard of § 402(a)(8)(A)(ii). Until 1962, there was no statutory or regulatory requirement that the States disregard work-related expenses in assessing a working recipient's income, although the successive federal agencies responsible for the AFDC program urged the States to do so as a matter of sound administrative practice. It appears that virtually all States acceded to that urging, at least to the extent of deducting mandatory tax withholdings, although practices varied widely as to other types of expenses. See App. 30–36, Bureau of Public Assistance, Social Security Administration, Department of Health, Education, and Welfare, Public Assistance Report No. 43: State Meth-

ods for Determining Need in the Aid to Dependent Children Program (March 1961). The practice of deducting withholdings continued after § 402(a)(7) was amended in 1962 expressly to require a State to take account of work expenses in determining income; of course, during this period the deduction and computation would have been the same whether the withholdings were subtracted from income pursuant to the work-expense disregard or not included in income in the first place.

The addition of the work-incentive disregard in 1967, however, made it necessary to detail the steps in the determination of need. In response, HEW promulgated detailed regulations on the application of these disregards to earned income. As noted above, one regulation, which has remained unchanged since its initial promulgation, defined "earned income" to mean

> "the total amount [of commissions, wages, or salary], irrespective of personal expenses, such as income-tax deductions, lunches, and transportation to and from work, and irrespective of expenses of employment which are not personal, such as the cost of tools, materials, special uniforms, or transportation to call on customers." 45 CFR § 233.20(a)(6)(iv) (1970).

Another regulation—which has also remained unchanged, though after OBRA it no longer applied to AFDC calculations—set forth the procedure by which the disregards would be applied:

> "The applicable amounts of earned income to be disregarded will be deducted from the gross amount of 'earned income,' and all work expenses, personal and non-personal, will then be deducted. Only the net amount remaining will be applied in determining need and the amount of the assistance payment." 45 CFR § 233.20(a)(7)(i) (1970).

The second regulation, echoing the terminology of the first, clearly treated mandatory tax withholdings as "personal"

work expenses. The authority for deducting such expenses, of course, by then was the work-expense disregard of § 402(a)(7).[8]

Administrative practice reflected the taxonomy of the regulations. Sometime after 1962, but well before the OBRA Congress acted, many States had come to treat tax withholdings as expenses "reasonably attributable to the earning of . . . income." A 1972 HEW study reported that virtually every State subjected mandatory payroll withholdings to the work-expense provision of § 402(a)(7). See App. 47, Department of Health, Education, and Welfare, Memorandum, Assistance Payments Administration, Social and Rehabilitation Service (Feb. 1, 1972). The Colorado program under consideration in *Shea* was said to treat mandatory payroll deductions as "expenses reasonably attributable to employment," 416 U. S., at 254–255, and the *Shea* Court assumed as much, *id.*, at 255. And, in 1977, the House Committee on Government Operations received a comprehensive report on the AFDC program which appeared to indicate that all of the 43 States that responded to the inquiry treated mandatory tax withholdings as deductible work expenses. Congressional Research Service, Administration of the AFDC Program: A Report to the Committee on Government Operations 98 (Comm. Print 1977).

There is no reason to suppose that the Congress that enacted OBRA legislated in ignorance of the then generally accepted categorization of mandatory tax withholdings as work expenses. To the contrary, the Senate Report described Congress' understanding of existing law:

> "In determining AFDC benefits, States are required to disregard from the recipient's total income: (1) the first $30 earned monthly, plus one-third of additional

[8] See also *Connecticut State Dept. of Public Welfare* v. *HEW*, 448 F. 2d 209, 216 (CA2 1971) (treating 45 CFR § 233.20(a)(6)(iv) (1970) to provide a nonexhaustive list of expenses reasonably attributable to the earning of income under § 402(a)(7)).

earnings; and (2) any expenses (including child care) reasonably attributable to the earning of such income . . . ." S. Rep. No. 97–139, p. 501 (1981).

It is unlikely that Congress would have omitted so important an independent step as the disregard of tax liabilities. Instead, the parenthetical mention of child-care expenditures presages their treatment in the revised § 402(a)(8) as the only type of work expense separately disregarded.

The House Conference Report describes the new provisions to the same effect:

"States would be required to disregard the following amount of earnings, in the following order:

"(a) *Eligibility Determination*—the first $75 of monthly earnings for full time employment (in lieu of itemized work expenses); and the cost of care for a child or incapacitated adult, up to $160 per child per month.

"(b) *Benefit Calculation*—the first $75 of monthly earnings for full time employment; child care costs up to $160 per child per month; and $30 plus one-third of earnings not previously disregarded." H. R. Conf. Rep. No. 97–208, pp. 978–979 (1981).

Again, we find it implausible that Congress would have provided an otherwise complete description of the proposed calculation, yet neglect to mention that "earnings" or "monthly earnings" did not include mandatory tax withholdings.

We acknowledge that the legislative history of the 1962 amendments, which codified the administrative policy that a state agency take account of work expenses in determining need, does not mention mandatory tax withholdings. See S. Rep. No. 1589, 87th Cong., 2d Sess., 17–18 (1962); H. R. Rep. No. 1414, 87th Cong., 2d Sess., 23 (1962). It is also true that in amending its guide to the States in response to the 1962 amendment of § 402(a)(7), HEW did not include such withholdings in its list of expenses reasonably attributable

to the earning of income. See App. 39–41, Department of Health, Education, and Welfare, Handbook of Public Assistance Administration, pt. IV, § 3140 (Apr. 22, 1964). This silence is at best ambiguous, however. The failure to mention these expenses well may have resulted from Congress' and HEW's recognition that the States, acquiescing in the longstanding policy of the federal agencies administering AFDC that state agencies attempt realistically to ascertain recipients' need, already deducted these expenses in determining eligibility and benefit levels. As the Court of Appeals recognized, the source of the authority to reduce countable income by the amount of various work expenses was unclear at this time. 707 F. 2d, at 1120. In any event, we must identify Congress' intention in 1981. It is clear that by then the practice of disregarding amounts withheld to satisfy tax liabilities had found a statutory home in the work-expense disregard of § 402(a)(7). It is equally clear that they were among the "itemized work expenses" which the OBRA Congress intended the flat-sum disregard to replace.

## B

The Court of Appeals recognized that "if mandatory payroll deductions enter into income at all, they must be treated as work-related expenses subject to the $75 ceiling enacted by OBRA, because no separate disregard for payroll withholdings exists." 707 F. 2d, at 1120. It avoided this conclusion, however, by rejecting its premise. According to the Court of Appeals, mandatory tax withholdings always had been excluded from the calculation of a working recipient's income by virtue of a long-enshrined principle of "actual availability," which, independently of any explicit statutory disregards, governed the definition of "income" for purposes of § 402(a)(7). Therefore, the substitution of the flat $75 disregard of § 402(a)(8) for the work-expense disregard of § 402(a)(7) had no effect on the treatment of tax payments,

which should continue to be deducted from a working recipient's earnings as the first step in any determination of need.

We disagree. Contrary to the conclusion of the Court of Appeals, the principle of actual availability has not been understood to distinguish the treatment of tax withholdings from that of other work expenses. Rather, it has served primarily to prevent the States from conjuring fictional sources of income and resources by imputing financial support from persons who have no obligation to furnish it or by overvaluing assets in a manner that attributes nonexistent resources to recipients.

The availability principle traces its origins to congressional consideration of the 1939 amendments to the Act. At that time, some Members expressed concern, specifically with regard to the old-age assistance program, that state agencies not assume financial assistance from potential sources, such as children, who actually might not contribute. See 3 Hearings Relative to the Social Security Act Amendments of 1939 before the House Committee on Ways and Means, 76th Cong., 1st Sess., 2254 (1939) (statement of A. J. Altmeyer, Chairman, Social Security Board); 84 Cong. Rec. 6851 (1939) (statement of Rep. Poage). Shortly after passage of the 1939 amendments, the Board adopted a policy statement applicable to various aid programs, including AFDC. See App. 17–20, Social Security Board Memorandum (Dec. 20, 1940). The statement cautioned the States that in effecting the new statutory directive to take into account a recipient's "income and resources," they must ensure that any such income or resources "actually exist," be not "fictitious" or "imputed," and "be actually on hand or ready for use when it is needed." A short time later, this policy statement was incorporated in substantially the same form in the Board's guidelines to the States, see App. 21–23, and successive federal agencies administering the AFDC program have continued to endorse the principle. See, e. g., HEW Handbook of Public Assistance Administration, pt. IV, § 3131.7

(1967) (quoted in *Lewis* v. *Martin*, 397 U. S. 552, 555, and n. 6 (1970)). At no time, however, have the federal AFDC agencies suggested that it demanded special treatment of mandatory tax withholdings.

This Court, too, has viewed the actual availability principle "clearly [to] comport with the statute," *King* v. *Smith*, 392 U. S., at 319, n. 16, and has not hesitated to give it effect in that case and others. See *Lewis* v. *Martin*, *supra; Van Lare* v. *Hurley*, 421 U. S. 338 (1975). But the Court's cases applying the principle clearly reflect that its purpose is to prevent the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need. For example, in *King* v. *Smith* the Court considered the actual availability regulation in holding that Alabama could not deny assistance to otherwise eligible children solely on the basis of their mother's cohabitation with a "substitute father," not their own, without regard to whether the putative substitute actually contributed to the children's support. 392 U. S., at 319–320, and n. 16.

The failure of the federal agencies administering AFDC to apply the availability principle to distinguish mandatory tax withholdings is not surprising. The sums they consume are no less available for living expenses than other sums mandatorily withheld from the worker's paycheck and other expenses necessarily incurred while employed. In implicit recognition of this analytic difficulty, the Court of Appeals, without helpful explanation,[9] purported to clarify the District Court's ruling by excluding "non-governmental deductions" from its compass, specifying that only federal, state, and local income taxes, social security taxes, and "state disability and equivalent governmental programs" could properly be denominated "non-income items." 707 F. 2d, at 1124. The

---

[9] The Court of Appeals suggested that tax withholdings "are easily verified," 707 F. 2d, at 1124, but so too are any other amounts whose deduction a payroll stub records.

individual respondents make an identical concession, Brief for AFDC Respondents 46, but they, also, fail to trace a similarly circumscribed rationale. Yet sums mandatorily withheld for obligations such as union dues, medical insurance, or retirement programs no more pass through the wage earner's hands than do mandatory tax withholdings. Insofar as the Court of Appeals' definition pivots on availability to meet family expenses, any distinction between various species of payroll withholdings would be "metaphysical indeed." *James* v. *O'Bannon,* 557 F. Supp. 631, 641 (ED Pa. 1982), aff'd, 715 F. 2d 794 (CA3 1983), cert. pending *sub nom. James* v. *Cohen,* No. 83–6168. Likewise, the expenditure of funds on other work-related expenses, such as transportation, meals, and uniforms, just as effectively precludes their use for the needs of the family. That they first pass through the wage earner's hands is a difference of no apparent import: "the time of payment seems . . . but a superficial distinction; all necessary expenses must be met sometime." *Dickenson* v. *Petit,* 728 F. 2d 23, 25 (CA1 1984), cert. pending, No. 83–6769. There is no reason, then, why the actual availability principle, once applied to exclude mandatory tax withholdings from the definition of income, would not similarly apply to other mandatory payroll withholdings and other standard work expenses, both of which also render a portion of a wage earner's income unavailable to meet the recipient family's needs. Yet this would negate Congress' enactment of the flat-sum work-expense disregard in 1981. The failure of the Court of Appeals to outline a principled limit to the applicability of the availability principle to sums deducted from gross income is telling.

The Court of Appeals, however, thought it "clear that the agency charged with the administration of this statute has long regarded it as dealing with net income exclusively." 707 F. 2d, at 1115. To support this conclusion, it cited the then-current regulation embodying the availability principle,

which, as republished after OBRA, provided that "'in determining need and the amount of the assistance payment . . . *[n]et* income . . . and resources available shall be considered . . . .'" *Ibid.*, quoting 45 CFR § 233.20(a)(3)(ii)(D) (1983), as amended by 47 Fed. Reg. 5647, 5675 (1982) (emphasis supplied by Court of Appeals).[10] The court, in our view, however, ignored the context in which the term "net income" appeared. The "net income" to which the regulation then referred was that for which the recipient family must account "after all policies governing the reserves and allowances and disregard or setting aside of income and resources . . . have been uniformly applied." 45 CFR § 233.20(a)(3)(ii) (1983); see also 45 CFR § 233.20(a)(3)(ii)(*a*) (1970). Among those "policies governing . . . disregard" was that governing earned income, which provided that "[o]nly the net amount remaining" after application of the work-incentive and work-expense disregards would be applied in determining need. 45 CFR § 233.20(a)(7)(i) (1970). This Court recognized the proper referent of "net income and resources" in *Shea* v. *Vialpando,* where we observed with regard to an earlier version of the regulation:

> "The 'income and resources' attributable to an applicant, defined in 45 CFR §§ 233.20(a)(6) (iii–viii), consist generally of 'only such net income as is actually available for current use on a regular basis . . . and only currently available resources.' 45 CFR § 233.20(a)(3)(ii)(c). . . . *In determining net income, any expenses reasonably attributable to the earning of income are deducted from gross income. 42 U. S. C. § 602(a)(7).* If, taking into

---

[10] In the 1984 version of the regulation, the words "[n]et income" are replaced by "[i]ncome after application of disregards." 45 CFR § 233.20(a)(3)(ii)(D) (1984). There are also other changes in subparagraph (D). See 49 Fed. Reg. 35586, 35592, 35600 (1984). The text at p. 35592 explains that the changes were in response to the Deficit Reduction Act to correct the "misinterpret[ations]" of the phrase "net income" in the prior version.

account these deductions and other deductions not at issue in the instant case, the net amount of 'earned income' is less than the predetermined statewide standard of need, the applicant is eligible for participation in the program and the amount of the assistance payments will be based upon that difference. 45 CFR § 233.20 (a)(3)(ii)(a) and (c)" (emphasis supplied). 416 U. S., at 253–254.

Thus, it is apparent that the net amount to which the regulation refers is that remaining after AFDC disregards, not simply payroll withholdings.

Finally, even accepting the view of the Court of Appeals that § 402(a)(7) "income" does not encompass mandatory tax withholdings, one reaches a much more limited result than respondents seek. In the face of the straightforward regulatory definition of "earned income" and Congress' reemployment of that term in reworking the § 402(a)(8) disregards, it is clear that the flat-sum disregard is to be deducted from total earned income, including mandatory tax withholdings, as provided by § 402(a)(8) and its implementing regulations. The putative rule excluding tax withholdings as "non-income items" under § 402(a)(7) income would also take total earnings as its starting point. Thus, the benefits each provides would be duplicative until deductions exceeded $75. Respondents' understanding of § 402(a)(7) would simply require the state agency to permit recipients to deduct the greater of either actual payroll deductions or $75. No party urges this construction, of course, because it would have been a senseless and cumbersome way for Congress to achieve such a result. But, for us, it demonstrates the implausibility of respondents' view of the interplay of § 402(a)(7) and § 402(a)(8).

C

Notwithstanding its conclusion that the actual availability principle had always governed the treatment of mandatory tax withholdings in calculating an AFDC family's need, and

continued to do so after enactment of OBRA, the Court of Appeals looked "primarily to congressional purpose" for its holding that these withholdings should be deducted independently of the flat-sum disregard. 707 F. 2d, at 1110. As the court noted, the AFDC statute has long sought to

"enabl[e] each State to furnish financial assistance . . . to needy dependent children and the parents or relatives with whom they are living . . . and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . ." § 401, 42 U. S. C. § 601.

See *Shea* v. *Vialpando,* 416 U. S., at 253. While acknowledging the cost-cutting focus of the OBRA amendments, the Court of Appeals reasoned that its construction best accommodated what it saw as the competing purposes of the 76th and 97th Congresses. First, citing the elimination after the first four months of employment of the $30 and one-third, work-incentive disregard, which it regarded as OBRA's "chief economizing feature," as well as the imposition of a cap on the child-care and work-expense disregards, the court opined that other changes in the statutory disregards fully accomplished any budgetary savings intended by the OBRA Congress. Next, it reasoned that the unchanged statement of statutory purpose compelled its construction, which still resulted in a disincentive to employment, because it produced a lesser disincentive than that effected by the Secretary's regulations. Finally, seeing "no reason to believe that AFDC recipients will work in order to pay handsomely for the privilege," it decided that in the long term the OBRA Congress' desire to reduce welfare expenditures would best be accomplished by avoiding or minimizing financial penalties on employed recipients. 707 F. 2d, at 1123.

We agree with the Court of Appeals that the OBRA Congress neither changed the language of the AFDC statement of purpose nor abandoned the statutory goals. We also

agree that the new scheme, as implemented by the Secretary, threatens to dissipate any incentive to employment, in some cases perhaps even forcing recipients who wish to work to apportion a smaller sum to family expenses than if they stayed at home. Unlike the Court of Appeals, however, we hesitate to tell Congress that it might have achieved its budgetary objectives by less than the full range of changes it chose to utilize, particularly when the information provided Congress by its own Budget Office, on which it presumably relied, belies that conclusion. See S. Rep. No. 97–139, at 447, 552. More importantly, it seems plain to us that the risk of creating disincentives to employment that would lead to increased expenditures down the road did not trouble the OBRA Congress.

During the House hearings on the OBRA changes to the AFDC statute, Representative Stark voiced concern that the new scheme would put a working mother to the distressing choice of either quitting her job or making do with less money to devote to her family's needs. See Administration's Proposed Savings in Unemployment Compensation, Public Assistance, and Social Services Programs: Hearings before the Subcommittee on Public Assistance and Unemployment Compensation of the House Committee on Ways and Means, 97th Cong., 1st Sess., Ser. No. 97–7, p. 3 (Comm. Print 1981). Representative Rangel feared that "[t]he marginally poor, actually penalized . . . for working, would have a great disincentive to continue to work." Id., at 41. Other Members and numerous private witnesses issued similar warnings. See, e. g., id., at 26 (Rep. Russo); id., at 46 (Rep. Chisholm); id., at 318 (Kevin M. Aslanian, Welfare Recipients League, Inc.). And the report of the Congressional Budget Office, included in the Senate Report, expressly called Congress' attention to the possibility that the work-expense cap and temporal limitation on the work incentive disregard would "increase the work disincentives found in the current AFDC program." S. Rep. No. 97–139, at 552.

In the face of these warnings, we must assume that Congress enacted the proposed changes in full awareness of the employment disincentives some Members felt the changes threatened to create.

Indeed, the concerns which underlay the decision of the Court of Appeals in this case prompted the House Subcommittee on Public Assistance and Unemployment Compensation to draft a version of § 402(a)(8) which would have increased substantially the flat work-expense disregard. The Subcommittee proposed to allow a work-expense deduction of the lesser of 20% of earned income or $175. See 127 Cong. Rec. 14476 (1981). But the House rejected this version and, instead, passed a substitute identical to that passed by the Senate. See id., at 14681–14682; H. R. Conf. Rep. No. 97–208, at 978–979. Again, Members sounded warnings of the consequences of the administration substitute. See 127 Cong. Rec. 14104 (1981) (Rep. Rostenkowski); id., at 14663–14664 (Rep. Biaggi). These concerns, however, did not deter the OBRA Congress.

Instead, as the Court of Appeals for the Third Circuit has observed, the legislative history indicates that, "[h]aving determined that providing financial incentives for work was not achieving the goal of self-sufficiency and that such incentives were leading to ever-increasing public expenditures, Congress embarked on a new course." James v. O'Bannon, 715 F. 2d, at 809. In proposing to limit the $30 and one-third disregard to the first four months of employment, for example, the Senate Budget Committee expressed impatience that the program then in effect was not inducing AFDC mothers to achieve self-sufficiency. S. Rep. No. 97–139, at 502–503. As a result, Congress sought other means that, in combination with the now temporally limited work-incentive disregard, might "decrease welfare dependency, and emphasize the principle that AFDC should not be regarded as a permanent income guarantee." Ibid. It chose to authorize the States to establish programs aimed at promoting employ-

ment among AFDC recipients. A State could establish a "community work experience program . . . designed to improve the employability of participants through actual work experience and training," § 409(a)(1), 42 U. S. C. § 609(a)(1), and it could condition AFDC eligibility on participation in the program. H. R. Conf. Rep. No. 97–208, at 980. A State could establish a "work supplementation program," under which it would "make jobs available, on a voluntary basis, as an alternative to aid otherwise provided under the State plan." § 414(a), 42 U. S. C. § 614(a). "Under this approach, recipients would be given a choice between taking a job or depending upon a lower AFDC grant . . . ." H. R. Conf. Rep. No. 97–208, at 980. And the State could establish a "work-incentive demonstration program" as an alternative to current work-incentive programs. § 445, 42 U. S. C. § 645; see H. R. Conf. Rep. No. 97–208, at 981. Participation in such a program would also be mandatory for persons eligible for AFDC. § 445(b)(1)(B), 42 U. S. C. § 645(b)(1)(B). See also § 402(a)(19), 42 U. S. C. § 602(a)(19). In conjunction with the amendments to the earned-income disregards, these provisions suggest a change in strategy on Congress' part—away from financial incentives and toward programs designed to find employment for recipients and oblige them to take it.

Thus, it is clear that the OBRA Congress elected to pursue unchanged goals by new methods. By concluding that Congress could not have intended to include mandatory tax withholdings in the new $75 disregard because such a rule would dilute financial incentives to work, the Court of Appeals ignored the congressional choices manifest in the departure from approaches previously favored.

## D

Were there any doubt remaining as to Congress' intention in 1981, subsequent congressional action would dispel it. In the immediately succeeding session, certain Members of the

House Committee on Ways and Means introduced H. R. 6369, 97th Cong., 2d Sess. (1982), by which they attempted to restore the financial work incentives eliminated by OBRA. The attempt failed. The Report accompanying the bill, however, describes the pre-OBRA state of the law. The Committee first noted that the "countable income" which determined eligibility equaled "gross income minus the disregards." H. R. Rep. No. 97–587, pt. 1, p. 6 (1982). Later, it referred to the potential disincentive posed, prior to the 1962 and 1967 amendments, by "any work-related expenses—such as transportation and child day care costs, and mandatory tax and other wage deductions." *Id.*, at 12. It also listed the components of an AFDC family's pre-OBRA "disposable income (wages minus work expenses plus AFDC benefits)." *Ibid.* Finally, it recounted the pre-OBRA calculation of need: "States were required to reduce the State monthly payment by the amount of the family's earnings that remained after the following amounts had been excluded or disregarded: (1) the first $30 of earnings; (2) plus one-third of remaining earnings; (3) plus work expenses for the month (any expenses, including child day care, reasonably attributable to the earning of income)." *Ibid.* Each of these statements indicates that the OBRA Congress regarded mandatory tax withholdings as standard work expenses; none admits of the possibility that they might have constituted an independent deduction.

We take great care, of course, before relying on the understandings of Members of a subsequent Congress as to the actions of an earlier one, but we by no means eschew what guidance they offer. *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 117–120, n. 13 (1980); *Cannon* v. *University of Chicago*, 441 U. S. 677, 686–687, n. 7 (1979). Here, we face the considered statements of a Committee whose Members were in the thick of the fight over earned-income disregards in the preceding session of the same Congress. And those statements clearly reveal the

common ground of that fight that the existing scheme did not independently disregard mandatory tax withholdings, but grouped them with other work expenses which the new flat-sum disregard would subsume.

The most recent confirmation of Congress' intentions in this matter came with enactment of the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, which, by its § 2625, 98 Stat. 1135, amends § 402(a)(8) to provide that "in implementing [the section], the term 'earned income' shall mean gross earned income, prior to any deductions for taxes or for any other purposes." The legislative history demonstrates that Congress enacted this provision in order to resolve the very dispute presented here. Specifically noting that the Courts of Appeals had come to conflicting conclusions on the matter and that this Court had granted the petition for certiorari in this case, the Conference Report leaves no doubt that Congress intended to endorse the competing construction. H. R. Conf. Rep. No. 98–861, pp. 1394–1395 (1984). The Senate echoed the House explanation:

"The statute would be amended to make clear that the term 'earned income' means the gross amount of earnings, prior to the taking of payroll or other deductions. The provisions in the AFDC statute which require that specified amounts of earned income be disregarded in determining eligibility and benefits have historically been interpreted as requiring that such amounts be deducted from gross, rather than net, earnings.

"The Committee agrees with the Department that there was no intention to change this interpretation when it approved the 1981 AFDC amendments. The Committee notes that when the Congressional Budget Office estimated the savings expected to be derived from the changes in 1981, it followed the interpretation shared by the Department and the Committee that the proposed disregards would apply to gross earnings." 1 Senate

Committee on Finance, Deficit Reduction Act of 1984, 98th Cong., 2d Sess., 982 (Senate Print 98–169, 1984). Thus, the 98th Congress reiterated its immediate predecessor's intentions not just by words but by deed—not only did it express in legislative history the "histori[c] interpret[ation]" of the relevant income, but it found it sufficient in resolving the disagreement to amend only § 402(a)(8). This 1984 legislation, which, it was said, sought to "[c]larif[y] current law," Senate Print, at 79, leaves no doubt as to the prospective interpretation of the statute,[11] but it carries in addition considerable retrospective weight. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 166–167, and n. 19 (1982); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 380–381 (1969); *FHA* v. *The Darlington, Inc.,* 358 U. S. 84, 90 (1958). In conjunction with contemporaneous evidence and the 1982 House Report, it removes all doubt.

## IV

In sum, while it appears that from the early days of the AFDC program the States regularly have excluded mandatory tax withholdings when determining need, it is clear to us that from some time after the addition in 1962 of the work-expense disregard of § 402(a)(7), and certainly by the time of OBRA, they did so pursuant to the directive of that section to disregard expenses "reasonably attributable" to the earning of income. All the available evidence indicates that the Congress that enacted the OBRA changes in the AFDC program also viewed tax liabilities as work expenses subject to the § 402(a)(7) disregard. That congressional understanding compels the conclusion that mandatory tax withholdings were among the items encompassed by the flat-sum disregard of § 402(a)(8).

---

[11] See *Heckler* v. *Turner,* 468 U. S. 1305, 1306–1307 (1984) (REHNQUIST, J., in chambers).

Respondents and their *amici* have offered various policy reasons why the disincentive to employment effected by the failure fully to account for work expenses is wrong. They point to the value, both pecuniary and inherent, of the search for and maintenance of employment, as well as to the long-term costs to the States in discouraging AFDC families' efforts toward economic independence. We, however, do not sit to pass on policy or the wisdom of the course Congress has set. Our task is only to determine that the Secretary has identified it correctly. We are satisfied that she did.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*