926 F.2d 906
 Joy TOMAS, Plaintiff-Appellant,
v.
Winona RUBIN, individually and in her capacity as Director
of the Hawaii Department of Human Services; Catherine Jean
Carman, individually and in her capacity as Administrator of
the Hawaii Child Support Enforcement Agency, Defendants-Appellees.
 No. 90-15201.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1990.
Decided Feb. 26, 1991.
 
 John Ishihara, Legal Aid Society of Hawaii, Honolulu, Hawaii, for plaintiff-appellant.
 Thomas D. Farrell, Deputy Atty. Gen., and G. Cher Foerster, Deputy Attorney Gen., Honolulu, Hawaii, for defendants-appellees.
 Before SKOPIL, BEEZER and FERNANDEZ, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 Joy Tomas appeals a grant of summary judgment in favor of Hawaii's Department of Human Services (DHS) and Child Support Enforcement Agency (CSEA) (together, the Agencies). The Agencies determined that she was ineligible for benefits under the Aid to Families with Dependent Children program (AFDC) because she did not cooperate in identifying the father of her child, despite her attestation that she had divulged all the relevant information she possessed. We hold that such an attestation may be overcome only by substantial evidence that the attestation was false and remand for further administrative proceedings.
 
 
 2
 * In October 1988 and January 1989, Joy Tomas applied for benefits for herself and her unborn child under the Aid to Families with Dependent Children program, 42 U.S.C. Secs. 601-615 (1988). Both applications were denied on the ground that she failed to cooperate in the efforts of the Agencies to identify the father of her child. After the child was born in February 1989, AFDC benefits were approved for the child, but benefits for Tomas continued to be denied on the ground that she failed to cooperate.
 
 
 3
 After Tomas applied for benefits, but before she met with any state official to discuss her application, a CSEA investigator called Tomas' home and asked the man who answered the telephone about the father of Tomas' child. The man responded, "We all mad at him. He can't come over here." The investigator believed this response suggested the man knew the identity of the father of Tomas' child.
 
 
 4
 At their first interview, the investigator explained to Tomas that the regulations governing AFDC required Tomas to cooperate in identifying the father. When the investigator then asked Tomas who is the father of her child, Tomas replied, "Why do you want to know? I don't have to tell you." After the investigator explained again the importance of cooperating, Tomas explained that she went to a concert in Waikiki with some "girlfriends," where they met a group of men with whom they went across the street to the beach, paired up and had sexual intercourse. The man with whom Tomas paired up identified himself only as "Boy." After they had intercourse, they returned to the concert. Boy left to go to the bathroom and never returned.
 
 
 5
 When the investigator asked if the other women might know Boy's real name, Tomas responded that they might, but when the investigator asked for their names, Tomas said she did not know them because she had only met them that day. Tomas gave a detailed description of Boy and signed a statement declaring that she did not know anything more about the identity of the father of her child.
 
 
 6
 Tomas met with the CSEA investigator at least three more times. Her story remained consistent through the interviews. Twice she went to the CSEA office without an appointment. At least three times she signed attestations that she had no further information. The CSEA investigator stated that at one of the interviews Tomas called her a liar and said "fuck you" as she left.
 
 
 7
 After this suit was initiated, investigation by the CSEA led to the discovery that Tomas had told friends and co-workers that Russell Deponte was the father of her child. When contacted, Deponte agreed he could be the father, but a DNA blood test proved that he was not.
 
 
 8
 After Tomas was denied benefits, she brought a class action on behalf of
 
 
 9
 [a]ll persons in the State of Hawaii who have been, are being, or will be denied, reduced or terminated from AFDC benefits because of their failure to cooperate with the Department of Human Services and Child Support Enforcement Agency in identifying the absent parent of their dependent children despite their attesting to the lack of information under penalty of perjury.
 
 
 10
 The district court approved a stipulation to certify the class. Tomas claimed that the Agencies violated state and federal statutes and administrative regulations by finding her noncooperative, and that the definition of "cooperate" was so vague as to violate her rights to due process and equal protection. She also sought an injunction prohibiting the Agencies from denying AFDC benefits on the basis of noncooperation to those applicants who attest, under penalty of perjury, that they have no knowledge of the identity of a dependent child's father.
 
 
 11
 On January 17, 1990, the district court granted summary judgment in favor of the Agencies. Tomas appeals that judgment.
 
 II
 
 12
 AFDC provides "financial assistance to needy dependent children and the parents or relatives who live with and care for them." Heckler v. Turner, 470 U.S. 184, 189, 105 S.Ct. 1138, 1141, 84 L.Ed.2d 138 (1985) (quotation omitted). Under the program, if a state administers its assistance program in accordance with the requirements of all applicable federal statutes and regulations, it is reimbursed by the federal government for a percentage of the grants the state chooses to give. Id.; 42 U.S.C. Sec. 602 (1988). One requirement is that
 
 
 13
 [a] State plan for aid and services to needy families with children must ... provide that, as a condition of eligibility for aid, each applicant or recipient will be required ... to cooperate with the State (i) in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed, and (ii) in obtaining support payments for such applicant and for a child with respect to whom such aid is claimed, ... unless (in either case) such applicant or recipient is found to have good cause for refusing to cooperate....
 
 
 14
 42 U.S.C. Sec. 602(a)(26)(B) (1988).
 
 
 15
 Federal regulations define cooperation as including:
 
 
 16
 any of the following actions that are relevant to, or necessary for, [inter alia, establishing paternity]:
 
 
 17
 (1) Appearing at an office of the State or local agency or the child support agency as necessary to provide verbal or written information, or documentary evidence, known to, possessed by, or reasonably obtainable by the applicant or recipient;
 
 
 18
 (2) Appearing as a witness at judicial or other hearings or proceedings;
 
 
 19
 (3) Providing information, or attesting to the lack of information, under penalty of perjury; and
 
 
 20
 (4) Paying to the child support agency any support payments received from the absent parent....
 
 
 21
 45 C.F.R. Sec. 232.12(b) (1989). If the caretaker relative fails to cooperate, the regulations specify that "the State or local agency will ... [d]eny assistance to the caretaker relative without regard to other eligibility factors," but will nevertheless provide assistance to the eligible child. Id. Sec. 232.12(d).
 
 
 22
 The state of Hawaii has implemented these requirements in its administrative regulations:
 
 
 23
 (a) Each AFDC individual shall be required to cooperate with the department in:
 
 
 24
 (1) Identifying and locating the parent of the child for whom aid is being claimed; [and]
 
 
 25
 (2) Establishing the paternity of a child born out of wedlock for whom aid is being claimed....
 
 
 26
 (b) An individual may be required to:
 
 
 27
 (1) Appear in court or at the department's child support enforcement agency as may be necessary, to provide information and evidence, known to, possessed by, or obtainable by the individual that may be [sic ] achieving the objective of enforcing child support obligations; [and] ...
 
 
 28
 (3) Provide information, or attest to the lack of information, possessed or reasonably obtainable by the individual under penalty of perjury....
 
 
 29
 (c) If the needy relative with whom a child is living fails to comply with the requirements of subsections (a) and (b), the relative shall be denied financial assistance....
 
 
 30
 Hawaii Administrative Rules (H.A.R.) Sec. 17-640-15.
 
 III
 
 31
 Tomas insists that her attestation that she had no further information regarding the identity of the father of her child, made under penalty of perjury, is sufficient to satisfy her duty to cooperate unless the Agencies have proof, based on "credible independent evidence," that she had "actual knowledge" of the identity of the father. However, by using the conjunctive "and" in the definition of "cooperate," both the federal regulations and those of the state of Hawaii make clear that in addition to an attestation of lack of information an AFDC applicant may be required to cooperate in other ways. The federal regulation states that "cooperate includes any " of the enumerated actions "that are relevant to, or necessary for," identifying and locating the absent parent, establishing paternity or obtaining support payments. 45 C.F.R. Sec. 232.12(b) (1988) (second emphasis added). Thus an attestation of lack of information satisfies only the duty to give all relevant information known at the time of the attestation; the attestation alone cannot satisfy the duty to appear at the state office to provide subsequently acquired information,[1] to appear as a witness or to pay support payments to the child support agency. See 45 C.F.R. Sec. 232.12(b) (1988).[2]
 
 
 32
 Although attestation is only one element of cooperation under the regulations, Tomas is correct that an attestation is meaningless if it may be ignored completely. To give meaning to the inclusion of the attestation in the definition of cooperation, an attestation of lack of information should create a presumption of cooperation that may be overcome by showing that the attestation was false, or that the applicant failed to cooperate in one of the other respects required by 45 C.F.R. Sec. 232.12(b) and H.A.R. Sec. 17-640-15.[3]
 
 
 33
 In the present case, the district court held that in determining cooperation after an attestation was signed, the AFDC agencies may appropriately consider "relevant credible evidence from any source ... regardless of whether such evidence is dependent or independent of the applicant's testimony." Tomas proposes that only "credible independent evidence" may be used to question the veracity of an attestation of lack of information. She contends that such evidence must be in the form of "documents, statements, or other tangible proof" from a source other than the AFDC applicant. She argues that such evidence may not include assumptions about what the AFDC applicant should know or minor inconsistencies in the applicant's own statements. Tomas goes too far, however, because disqualifying all statements from the applicant would allow her to avoid giving any information simply by attesting to lack of knowledge.
 
 
 34
 We hold that an attestation of lack of further information may be overcome where the agency has substantial evidence that the attestation was false. The substantial evidence standard is familiar in the context of welfare eligibility decisions. See, e.g., 42 U.S.C. Sec. 423(f) (1988) (substantial evidence of enumerated facts required for the termination of disability insurance benefits); id. Sec. 1382c(a)(4) (1988) (substantial evidence of enumerated facts required to terminate supplemental security benefits for the aged, blind and disabled). This standard will also address Tomas' concerns: bare assumptions or inconsistencies in the applicant's statement unrelated to her attestation of lack of knowledge should not, without more, be considered substantial enough to overcome that attestation. See Woods v. United States, 724 F.2d 1444, 1451 (9th Cir.1984) ("Substantial evidence cannot be based upon an inference drawn from facts which are uncertain or speculative and which raise only a conjecture or a possibility.").IV
 
 
 35
 Tomas does not challenge the constitutionality of the federal and state statutes and regulations regarding the cooperation requirement. She argues, however, that the standards used by Hawaii's Department of Human Services and Child Support and Enforcement Agency to determine whether an AFDC applicant is cooperating violate due process by allowing the agencies "unfettered discretion" to define cooperation and grant or deny benefits.[4] The standards to which Tomas objects, however, are simply factors considered by caseworkers. They have not been promulgated as a regulation and are not binding. However tenuous the relation of any of these factors to actual cooperation may be, the requirement that a finding of noncooperation be supported by substantial evidence is a sufficient limitation on agency discretion.
 
 V
 
 36
 The district court granted summary judgment in favor of the Agencies' determination that Tomas did not cooperate. The court did not consider whether Tomas should have exhausted her administrative and state law remedies.
 
 
 37
 Under Hawaii law, an AFDC applicant or recipient who is determined to be non-cooperative may have that determination reviewed in a fair hearing at which she may present evidence and arguments relevant to the non-cooperation determination. See Haw.Rev.Stat. Secs. 91-9, 346-12, 346-13; see also Punohu v. Sunn, 66 Haw. 485, 666 P.2d 1133 (1983) (hearing at which welfare benefits reduced is a "contested case" subject to the requirements of Haw.Rev.Stat. Sec. 91-9). If the hearings officer affirms the non-cooperation determination, the aggrieved party may appeal to the state courts. See id. Sec. 91-14.
 
 
 38
 Where, as here, exhaustion of remedies is not required by statute, a district court has discretion to require exhaustion. Morrison-Knudsen Co. v. CHG Int'l, Inc., 811 F.2d 1209, 1223 (9th Cir.1987). In exercising its discretion, the court must "balance the agency's interest in applying its expertise, correcting its own errors, making a proper record, and maintaining an efficient, independent administrative system, against the interests of private parties in finding adequate redress." Id. (citations omitted).
 
 
 39
 In the present case, the essence of the non-cooperation determination was the credibility of and asserted contradictions in Tomas' statements. Despite genuine issues regarding the significance and weight of the evidence of non-cooperation, the Agencies have had no opportunity to address Tomas' claims or to hear her arguments. There is nothing to suggest that an administrative hearing, reviewed, if necessary, by the state courts, will not provide Tomas with an adequate remedy. Because we have articulated the standard to be applied to Tomas' attestation of lack of information, the Agencies are fully equipped to address the question of cooperation. Furthermore, because the obligation to cooperate is ongoing, see supra note 1, Tomas' burden is not made greater by requiring her to exhaust the remedies provided by Hawaii's statutes. In light of these facts, it would be an abuse of discretion not to require Tomas to exhaust her statutory remedies.
 
 
 40
 Because Tomas has not exhausted her administrative remedies, it was premature for the district court, and would be premature for us, to decide the question of whether she did or did not cooperate. We therefore REVERSE the summary judgment that was granted in favor of the Agencies on the merits of her claim. We REMAND to the district court with instructions to stay Tomas' individual action pending her exhaustion of state administrative remedies.
 
 
 
 [1]
 An AFDC recipient "has a continuing duty to cooperate so long as she is receiving aid, and therefore could be obligated to respond to questions or to proffer information at a subsequent time if events occurred to warrant such activity." Johnson & Blong, The AFDC Child Support Cooperation Requirement, 20 Clearinghouse Rev. 1389, 1394 (March 1987). See 42 U.S.C. Sec. 602(a)(26) (1988) ("[E]ach applicant or recipient will be required ... to cooperate.") (emphasis added); 45 C.F.R. Sec. 233.10(a)(1)(B) (1989) (A state may "[i]mpose conditions ... which, if not satisfied, result in the denial or termination of public assistance.") (emphasis added). An applicant or recipient must therefore disclose any relevant information obtained subsequent to her attestation. Evidence showing that she has not done so is a proper basis for a finding of noncooperation
 
 
 [2]
 As support for her proposition, Tomas relies on an interpretation of the cooperation requirement in a letter written by an official of the Department of Health, Education and Welfare:
 If an AFDC applicant or recipient maintains, under penalty of perjury, that she does not know the name or address of the absent father, this does not constitute noncooperation. In the absence of evidence to the contrary, the agency does not impose penalties for noncooperation unless evidence is available to show that the applicant or recipient did know the name or address of the absent father or in some other way failed to cooperate.
 (Emphasis supplied by Tomas.) Tomas ignores, however, the letter's statement that penalties for non-cooperation may be imposed if the applicant failed to cooperate "in some other way."
 
 
 [3]
 Commentators agree that "a woman who submits limited information but attests to her lack of any other information should be considered to be cooperating and thus eligible for aid unless and until she takes some action that amounts to noncooperation or until the agency determines that her statements are not credible." See Johnson & Blong, The AFDC Child Support Cooperation Requirement, 20 Clearinghouse Rev. 1389, 1394 (March 1987)
 
 
 [4]
 In response to an interrogatory asking what standards are used "for determining that an AFDC applicant or recipient is being noncooperative," appellees gave the following list:
 Cooperative
 Willingness to talk and provide information.
 Giving complete answers.
 Maintaining a pleasant, conversational tone of voice and demeanor during the interview.
 Acting friendly.
 Interested/sincere in wanting paternity established.
 Maintaining eye contact.
 Furnishing names of possible witnesses, friends, acquaintances who might know possible father.
 Non-Cooperative
 Evasive/inconsistent answers.
 Nervous/distrustful/hostile attitude.
 Defensive demeanor.
 Antagonistic behavior from start of interview.
 No eye contact.
 No attempt to describe possible father in any way, cannot recall any information regarding possible father, the way they met, where they went, how many times did they meet, what friends or acquaintances were involved, etc.
 Conflicting information furnished.