955 F.2d 506
 Jane ZEIEN, individually and on Behalf of others similarly
situated, Appellant,
v.
Charles M. PALMER, Acting Director of Iowa Department of
Human Services, Appellee,
v.
Louis W. SULLIVAN, M.D., in his official capacity as
Commissioner, United States Department of Health
and Human Services, Appellee.
 No. 90-2744.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 16, 1991.
Decided Jan. 23, 1992.
Rehearing and Rehearing En Banc Denied
March 10, 1992.
 
 John S. Allen, Iowa City, Iowa, argued (Thomas A. Krause, Des Moines, Iowa, and Seth Levy, Denise Lisio and Bruce Nestor, Iowa City, Iowa, on brief), for appellant.
 Madeline Nesse, Washington, D.C., argued (Gene W. Shepard, U.S. Atty. and John Beamer, Asst. U.S. Atty., Des Moines, Iowa, appeared on brief), for appellee Louis W. Sullivan.
 Daniel W. Hart, Des Moines, Iowa, argued (Bonnie J. Campbell, Atty. Gen. and Gordon E. Allen, Deputy Atty. Gen., appeared on brief), for appellee Charles M. Palmer.
 Before LAY,* Chief Judge, and HEANEY and BRIGHT, Senior Circuit Judges.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Jane Zeien brought this action on behalf of herself and others similarly situated under 42 U.S.C. § 1983 and title IV-A of the Social Security Act, 42 U.S.C. §§ 601-617 (1988). She challenges the Iowa Department of Human Services' (IDHS) policy of canceling a family's Aid to Families with Dependent Children (AFDC) benefits based on the receipt in a single month of a child support payment that exceeds the state's standard of need for AFDC. Zeien claims that the Social Security Act and federal AFDC regulations require IDHS to make a best estimate of the likelihood that child support payments will continue before terminating AFDC benefits. The district court found that IDHS need not estimate the likelihood of child support continuing before terminating AFDC benefits, but that it must make a corrective payment in the first month of AFDC ineligibility if anticipated child support is not received. Zeien appeals from that portion of the district court's order which concludes that the IDHS termination policy comports with the Social Security Act and regulations. We affirm.
 
 BACKGROUND
 
 2
 Zeien, the divorced mother of four minor children, began receiving AFDC benefits of $490 per month in June 1987. Court orders entered on August 3 and December 1, 1987 required Zeien's ex-husband to pay her child support of $320 per month, increasing to $600 per month in March 1988. As required by the Social Security Act and regulations for AFDC eligibility, Zeien assigned her right to child support to the State of Iowa. See 42 U.S.C. § 602(a)(26)(A) (1988); 45 C.F.R. § 232.11(a)(1) (1990).
 
 
 3
 Zeien's ex-husband made the following child support payments to the Collection Services Center (CSC), a branch of IDHS:
 
 
 4
 Date Amount
August 1987 $ 0
September 1987 0
October 1987 750
November 1987 600
December 1987 390
January 1988 80
February 1988 0
March 1988 0
April 1988 1,040
May"November 1988 0
 
 
 5
 Zeien's AFDC benefits were canceled for September 1987.[1] She reapplied and again received AFDC benefits for the months of January through May 1988. Based on the child support payment of $1,040 in April 1988, IDHS canceled Zeien's AFDC benefits effective June 1, 1988.[2]
 
 
 6
 Zeien's ex-husband failed to make child support payments in May and June 1988. Zeien reapplied for AFDC on June 9, 1988, and again began receiving benefits on July 1, 1988. She received no child support, AFDC grant, or corrective payment for June 1988, and therefore had no income with which to support her family during that month.
 
 
 7
 Zeien brought this action against Charles M. Palmer, director of IDHS, alleging that the cancellation of AFDC benefits based on a presumption that child support payments will continue following a single payment violates the Social Security Act and federal AFDC regulations. Zeien sought declaratory and injunctive relief, class certification, and an order requiring IDHS to notify class members of the possibility of monetary relief through state administrative channels. Palmer brought a third-party complaint against Louis W. Sullivan, Secretary of Health and Human Services (HHS), claiming that IDHS' policy resulted from its compliance with regulations promulgated by HHS. Palmer sought an order requiring HHS to provide federal financial participation in any AFDC paid pursuant to a judgment for Zeien, and enjoining HHS from penalizing IDHS for noncompliance with the Social Security Act for any AFDC paid pursuant to such a judgment.
 
 
 8
 The district court held that HHS regulations require cancellation of AFDC in the second month after receipt of a support payment exceeding the AFDC need standard without a best estimate of the likelihood of support payments continuing. The court found that the regulations were reasonable and were the product of a permissible construction of the Social Security Act by HHS. The court also held, however, that 42 U.S.C. § 602(a)(22) requires IDHS to make corrective payments for months of AFDC ineligibility when anticipated child support payments are not received. The court entered a declaratory judgment to this effect and enjoined IDHS from continuing its policy of refusing to make corrective payments. The court certified a class of all Iowa residents whose AFDC benefits were terminated after January 13, 1987 due to a child support payment, or whose AFDC benefits will be terminated in the future due to such payments. The court ordered IDHS to notify class members of their right to corrective payments for months of AFDC ineligibility in which anticipated support payments did not materialize.
 
 DISCUSSION
 
 9
 Zeien claims on appeal that the district court erred in concluding that the Social Security Act and HHS regulations do not require IDHS to make a best estimate of the likelihood of child support payments continuing before terminating AFDC benefits. The district court adopted the interpretation of the statute and regulations advanced by HHS as a third-party defendant. Zeien's argument therefore impliedly suggests either that HHS has misinterpreted its own regulations or that it has promulgated regulations inconsistent with the Social Security Act.
 
 
 10
 The Supreme Court articulated the standard by which we review an agency's interpretation of the statute the agency administers in Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):
 
 
 11
 First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, ... as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute....
 
 
 12
 Id. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted). If Congress authorizes an agency to promulgate regulations to fill statutory gaps, such regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 843-44, 104 S.Ct. at 2782.
 
 
 13
 Congress created the AFDC program "to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them." Shea v. Vialpando, 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974). The Social Security Act restricts eligibility for AFDC to only the neediest families, excluding any family whose combined assets exceed $1,000 in value. See 42 U.S.C. § 602(a)(7)(B) (1988).[3] States choosing to participate in the program receive reimbursement from the federal government for a percentage of the funds they expend. See 42 U.S.C. § 603 (1988); Heckler v. Turner, 470 U.S. 184, 189, 105 S.Ct. 1138, 1141, 84 L.Ed.2d 138 (1985). Participating states, in return, must administer their AFDC programs according to state plans that conform to applicable federal statutes and regulations. See 42 U.S.C. § 602 (1988); Turner, 470 U.S. at 189, 105 S.Ct. at 1141.
 
 
 14
 The Social Security Act requires each state participant in the AFDC program to implement a plan designed to maximize the collection of child support payments from absent parents. See 42 U.S.C. § 602(a)(27) (1988); see also 42 U.S.C. §§ 651-669 (1988) (Child Support Enforcement Act). One purpose of this requirement is to reduce welfare costs by increasing child support collections. See S.Rep. No. 1356, 93d Cong., 2d Sess. 13-14, reprinted in 1974 U.S.Code Cong. & Admin.News 8133, 8145-46 ("The problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their absent parents."). To this end, each state AFDC plan must require AFDC recipients to assign to the state their rights to child support as a condition of eligibility for aid. See 42 U.S.C. § 602(a)(26)(A) (1988). Child support payments ordinarily are made directly to the state child support collection agency, which distributes them according to a formula set forth in the statute and regulations. See 42 U.S.C. § 657 (1988); 45 C.F.R. § 302.51(b) (1990).
 
 
 15
 The Social Security Act also requires the state AFDC agency to consider all income and resources of all members of a recipient family in determining the need for aid. See 42 U.S.C. § 602(a)(7) (1988). The Act authorizes a monthly income reporting and retrospective budgeting system to determine eligibility and need for aid. See 42 U.S.C. § 602(a)(13)(A)(i) (1988) (the state agency will determine eligibility for aid for a month based on the family's income, composition, resources, and other similar relevant circumstances during that month); 42 U.S.C. § 602(a)(13)(A)(ii) (1988) (the state agency will determine the amount of aid based on the family's income and other relevant circumstances in the first or second month preceding the month in which the aid is to be paid).
 
 
 16
 HHS has promulgated additional regulations governing the determination of eligibility and need for AFDC, and prescribing the method by which state AFDC agencies must consider child support payments in making those determinations. The state agency must determine AFDC eligibility prospectively for each payment month based on the agency's "best estimate of income and circumstances which will exist in the month for which the payment is made." 45 C.F.R. § 233.33(a) (1990). The estimate must be based on the agency's "reasonable expectation and knowledge of current, past or future circumstances." 45 C.F.R. § 233.31(b)(1) (1990). Once an individual has been found eligible for AFDC benefits, the state agency must reconsider or redetermine eligibility promptly whenever "a report is obtained which indicates changes in the individual's circumstances that may affect the amount of assistance to which he is entitled or may make him ineligible[.]" 45 C.F.R. § 206.10(a)(9)(ii) (1990).
 
 
 17
 The regulations provide an exception to the best estimate rule for child support collections. When the state child support collection agency reports a collection to the state AFDC agency, the AFDC agency must treat the amount of the collection as a change in circumstances requiring a review of eligibility under 45 C.F.R. § 206.10(a)(9)(ii). The agency must consider only that portion of a support collection which represents the support obligation for the current month. If that amount, when treated as if it were income, exceeds the state's standard of need, the AFDC agency must find the family ineligible for aid. See 45 C.F.R. §§ 232.20(b)(1), 302.51 (1990). Because eligibility is determined prospectively, a finding of ineligibility because of a sufficient child support payment will take effect either one or two months after the support collection is reported to the state AFDC agency. If the support collection is insufficient to render the family ineligible for aid, the amount of the collection will have no effect on the amount of the family's AFDC grant. 45 C.F.R. § 232.20(b)(1) (1990).
 
 
 18
 Zeien argues on appeal that IDHS violates 45 C.F.R. § 233.33(a) by failing to make a best estimate of the likelihood of child support payments continuing before finding a family ineligible for aid. As noted above, however, the regulations provide an exception to the best estimate rule for child support collections, requiring a redetermination of eligibility every time the child support collection agency reports a collection to the AFDC agency. See 45 C.F.R. §§ 233.33(b), 232.20(b), 302.32(b) (1990).
 
 
 19
 While we may disagree with HHS' decision to treat child support payments differently from other components of an AFDC recipient's income, we may not invalidate that decision unless it is arbitrary, capricious, or manifestly contrary to the Social Security Act. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. Congress has authorized HHS to promulgate regulations governing AFDC and child support enforcement by state agencies. 42 U.S.C. §§ 602(a)(5), 652(a)(1) (1988). Nothing in the Social Security Act prohibits HHS from drawing a distinction between child support payments and other forms of income used to calculate a family's eligibility for AFDC. Similarly, the Act does not preclude HHS from exempting child support from the best estimate rule, which was itself created by regulation rather than by statute. We therefore cannot conclude that the regulation exempting child support from the best estimate rule is manifestly contrary to the Social Security Act.
 
 
 20
 We are also unable to conclude that the regulations distinguishing child support from other income are arbitrary or capricious. Congress itself drew such a distinction by requiring that AFDC recipients' rights to child support be assigned directly to the state, rather than merely reported to the state as are other forms of income. See 42 U.S.C. § 602(a)(26) (1988). One purpose of giving states the responsibility of enforcing child support obligations was to ensure that child support payments replace AFDC benefits as promptly as possible. See S.Rep. No. 1356, 93d Cong., 2d Sess. 13, 20, reprinted in 1974 U.S.Code Cong. & Admin.News 8145, 8152. While the requirement that AFDC eligibility be redetermined based on each current support payment may not be the means this court would have adopted to effectuate congressional intent, it is sufficiently rational to preclude us from substituting our judgment for that of HHS. See Department of Social Servs. v. Bowen, 804 F.2d 1035, 1038 (8th Cir.1986).[4]
 
 
 21
 Moreover, we note that the hardship Zeien experienced when her anticipated child support failed to materialize is a direct result of the method Congress has required the state child support collection agency to use in distributing support collections which render a family ineligible for AFDC. Before October 1982, the Social Security Act required state child support collection agencies to pay directly to the family the full amount of the child support which was collected and used to determine the family's ineligibility for AFDC. This amount was paid to the family in the first month the family was ineligible for an AFDC payment. In addition, the family received any current support paid during the first month of ineligibility. Elimination of Double Support Payments, final rule amending 45 C.F.R. § 302.32 (background), 49 Fed.Reg. 22,287 (1984); see S.Rep. No. 494, 97th Cong., 2d Sess. 55, reprinted in 1982 U.S.Code Cong. & Admin.News 781, 831. If support payments continued, the family would receive two payments in its first month of ineligibility: the current payment for that month and the payment on which its ineligibility had been determined one or two months earlier. If support payments did not continue, the family received at least the one support payment on which its ineligibility had been determined, and again became eligible for an AFDC grant the following month, with no gap in income. Whether or not support payments continued, the family effectively received two payments for the month in which it was determined ineligible; one in the form of AFDC for that month paid before the support was collected, and one in the form of the support on which it was found to be ineligible and which it eventually received in its first month of ineligibility.
 
 
 22
 In 1982, Congress amended the Social Security Act to require the state child support collection agency to use the payment that rendered the family ineligible to reimburse the state for AFDC paid in the month for which the support payment was collected. Tax Equity & Fiscal Responsibility Act of 1982, Pub.L. No. 97-248, § 173(a), 96 Stat. 403 (1982) (codified at 42 U.S.C. § 654(5) (1988)) [hereinafter TEFRA]. Congress intended to eliminate double payment to an AFDC family for any single month, and to ensure reimbursement to the state and federal government for AFDC already paid in the month before the support was collected and known to make the family ineligible. S.Rep. No. 494, 97th Cong., 2d Sess. 55, reprinted in 1982 U.S.Code Cong. & Admin.News 781, 831. The Senate Finance Committee estimated that the amendment would save $11 million over the next three fiscal years. Id., reprinted in 1982 U.S.Code Cong. & Admin.News 831.
 
 
 23
 Recognizing that the amendment would cause hardship to families whose child support payments did not continue in the first month of AFDC ineligibility, HHS adopted a policy of issuing corrective payments to such families for the month of ineligibility and reinstating their AFDC grants the following month without reapplication. Memorandum from HHS Associate Commissioner for Family Assistance to HHS Regional Administrator, Region VIII (Oct. 19, 1983); see also 42 U.S.C. § 602(a)(22) (1988) (requiring state AFDC agencies to promptly correct any underpayment of aid); 45 C.F.R. § 233.20(a)(13)(ii) (1990) (requiring "prompt correction of any underpayments to current recipients and those who would be a current recipient if the error causing the underpayment had not occurred"). The district court found IDHS to be in violation of this policy because it did not issue corrective payments and required a family to reapply for AFDC before reinstating its aid.[5]
 
 
 24
 The lack of income in June 1988 that prompted Zeien to commence this action thus was the product of the TEFRA amendment prohibiting direct payment to the family of a child support collection sufficient to render the family ineligible for AFDC. See supra note 2 (describing distribution of Zeien's April 1988 child support payment pursuant to 42 U.S.C. § 654(5) and 45 C.F.R. § 302.51). Even if HHS regulations permitted IDHS to make a best estimate of the likelihood of continued child support before terminating AFDC benefits, distribution of child support collections as required under TEFRA would produce a similar lack of income whenever the agency wrongly predicted that child support would continue.
 
 
 25
 We recognize that automatic reinstatement and corrective AFDC payments do not eliminate hardship to AFDC families whose child support payments do not continue in their first month of ineligibility, because such families are likely to receive corrective payments no earlier than the first week of the following month. Because families must be virtually without assets to qualify for AFDC in the first place, failure to receive either AFDC or child support in a given month can leave a family with no means to pay for food, clothing, or shelter. The Supreme Court has noted:
 
 
 26
 Such suffering is frequently the tragic byproduct of a decision to reduce or to modify benefits to a class of needy recipients. Under our structure of Government, however, it is the function of Congress--not the courts--to determine whether the savings realized, and presumably used for other critical governmental functions, are significant enough to justify the costs to the individuals affected by such reductions.
 
 
 27
 Bowen v. Gilliard, 483 U.S. 587, 596, 107 S.Ct. 3008, 3014-15, 97 L.Ed.2d 485 (1987). We question the wisdom of Congress' determination that a potential annual savings of less than $4 million justifies the possible hardship to AFDC families who no longer are guaranteed receipt of at least one child support payment in their first month of ineligibility. Our task, however, is not to pass judgment on the wisdom of congressional policy choices. Unless those choices "run afoul of some constitutional edict, any inequities created by such decisions must be remedied by the democratic processes." Id. at 597, 107 S.Ct. at 3015.[6] Because the AFDC regulations at issue comport with the Social Security Act and are neither arbitrary nor capricious, we must uphold them.
 
 CONCLUSION
 
 28
 We affirm the order of the district court.
 
 
 29
 LAY, Chief Judge, dissenting.
 
 
 30
 I respectfully dissent. At issue is the Department of Health and Human Services' (HHS) policy which leaves poor families without any source of assistance when they are disqualified from further AFDC based on receipt of one month's child support.[1] Upon receipt Iowa presumes that payments will continue. This is true even if nonpayment intervenes between the initial collection and the month of cancellation. Thus, IDHS cancels benefits without any sort of estimate or projection that child support payments will continue. As a result of this presumption, a family may be without any means or benefits for at least three months. By cancelling benefits without any sort of estimate or projection that child support payments will continue, Iowa artificially imputes income that is not actually available to the family. See Heckler v. Turner, 470 U.S. 184, 201, 105 S.Ct. 1138, 1147, 84 L.Ed.2d 138 (1984).[2]
 
 
 31
 I respectfully submit that the Secretary's policy cannot be reconciled with the congressional mandate or the plain language of the enabling statute or effecting regulations. Where Congress has not established a specific rule which addresses how or when to treat child support as income, this court is charged with determining whether the agency's policy is "based on a permissible construction of the statute." Chevron, U.S.A. v. National Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[3]
 
 
 32
 The authority of an administrative agency to enact rules and regulations is limited by the statutory language under which the rules are enacted. North Dakota v. United States, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77, 85 (1983). No deference should be shown to an agency policy or decision if the agency "in the guise of interpretation, effects a change in statutory intent." Quarles v. St. Clair, 711 F.2d 691, 708 (5th Cir.1983). This court must strike down regulations that are "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782.
 
 
 33
 The Secretary's determination that a "best estimate" of a family's "actually available" resources need not be done prior to termination of AFDC benefits runs afoul of Congress's expression of the purpose of the AFDC program. HHS asserts that its policy is a rational manner in which to effect the government's goal of preventing double payment to AFDC families. This may be true. However, in effecting this "savings," HHS's policy undermines the primary goals of the enabling legislation and other secondary goals of the legislation, including reduction of expenditures on social programs. The AFDC legislation was primarily enacted
 
 
 34
 [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services ..., to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents and relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection,....
 
 42 U.S.C. § 601 (1988).[4]
 
 35
 To effect those goals, Congress charged the states be circumspect and consider factors other than current income when determining eligibility for assistance: "[t]he State agency (i) will determine a family's eligibility for aid for a month on the basis of the family's income, composition, resources, and other similar relevant circumstances...." 42 U.S.C. § 602(a)(13)(A) (1988) (emphasis added). Congress specified that each receiving family is to report the "income and resources it expects to receive, or any changes in circumstances affecting continued eligibility or benefit amount, that it expects to occur, in that month (or in future months )," so that the state may consider those factors when determining need. 42 U.S.C. § 602(a)(14)(A)(ii) (1988) (emphasis added). I respectfully submit it is arbitrary and contrary to the spirit of the Act to leave a family without AFDC even for a short period of time without considering "other relevant factors" concerning the likelihood of future child support payments. It is totally derelict and capricious to disqualify a family based on child support payments when the agency has easy access to the ex-spouse's sporadic payment history. This is especially true where the agency knows any future payment by the ex-spouse will be used to initially pay the arrearage due the agency.[5] Thus, the agency knows that, in a case like Ms. Zeien's, it is quite likely that child support payments, even if they were to continue, would not go to the custodial parent but to the government to pay for prior assistance. Under such circumstances, HHS's presumption is totally irrational.
 
 
 36
 HHS's presumption that child support will continue in the future even when the ex-spouse has a sporadic payment history must be viewed as attributing "nonexistent resources" to the family. HHS ignores the Supreme Court's decision in Heckler v. Turner, 470 U.S. 184, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1984), that need be based on income "actually available." The "actually available" principle "has served primarily to prevent the States from conjuring fictional sources of income and resources by imputing financial support from persons who have no obligation to furnish it or by overvaluing assets in a manner that attributes nonexistent resources to recipients." Id. at 200, 105 S.Ct. at 1147.[6]
 
 
 37
 In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the Court held that income of a cohabitating male companion of the mother could not be imputed to the family absent evidence that the companion actually contributed to the support of the children. HHS would distinguish King and Turner from the instant case because they involved situations in which the non-family member had no legal obligation to provide support, whereas in this case the ex-spouse is required to pay child support. The Turner decision, however, does not rest on whether someone was legally obligated to provide support to the family. The touchstone of Turner is whether income is in fact available, regardless of whether or not the family is legally entitled to it: "[T]he Court's cases applying the [availability] principle clearly reflect that its purpose is to prevent the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need." Turner, 470 U.S. at 201, 105 S.Ct. at 1147.
 
 
 38
 HHS attempts to justify its child support policy by conclusorily saying that "[t]he Federal policy in question here provisionally imputes support from persons who not only have an obligation to provide it but have done so in the immediate past!" (Appellee's Brief at 26). HHS never addresses whether its "imputing" income on which to evaluate eligibility for assistance is reasonable.[7] Instead, in circular fashion it argues that the "actually available" principle is satisfied by its unreasonable assumption of continued support payments. I fail to see the reasonableness of assuming that an absent parent who likely does not have a history of steady employment and who does have a history of failing to make child support payments will make payment the next month merely because he or she made one last month--perhaps for the first time in years. Certainly no bank or credit issuer would consider such a person a "good risk." The policy is arbitrary and capricious and thus no deference is owed it.
 
 
 39
 The enabling legislation was also intended to encourage the absent parent to fulfill his or her obligation to support the children. The Supreme Court noted in Bowen v. Gilliard, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1986), that it is possible that some non-custodial parents may object to the assignment of support funds to the government, and may decide to avoid payment for that reason. However, Congress itself has recognized that more often than not government participation in the process increases child support collection. Specifically, 42 U.S.C. § 602(a)(17) was added to the legislation by Congress to encourage and facilitate obtaining such support. Shirley v. Lavine, 365 F.Supp. 818 (N.D.N.Y.1973), aff'd, 420 U.S. 730, 95 S.Ct. 1190, 43 L.Ed.2d 583 (1975). HHS argues that ending AFDC at the earliest possible moment due to receipt of one child support payment may act to motivate absent parents to continue payments, where they would not otherwise. Congress obviously rejected this argument: Congress believed that child support collections would increase if the government took up collections, and therefore enacted section 602(a)(17).
 
 
 40
 HHS's policy actually motivates the working-poor absent parent not to send support payments to assist his children. The prospect of the family's losing AFDC assistance due to one support payment and being without funds with which to pay for food and shelter motivates the well-meaning absentee parent to withhold monetary support even when able to contribute, unless he or she is confident that payments can continue. By discouraging the working-poor absent parent from contributing to his or her children's support, the government actually promotes perpetual dependence on AFDC payments, thus depriving other children who might be eligible for assistance due to the finite nature of the program's resources and frustrating the program's attempt to give people a leg up and promote self-sufficiency. See Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974).
 
 
 41
 Should the child support payments not continue, the family would be without any resources with which to purchase shelter and food, not to mention utilities such as heat and water, for a minimum of one month. The family members may well face eviction from their shelter, lack of funds with which to travel to employment, disruption of children's educations, malnutrition or starvation. Such results are manifestly contrary to the stated purpose of the Aid to Families with Dependent Children Act. Furthermore, the prospect of eviction and malnutrition or severe hunger for his or her children will motivate the custodial parent to decline to help authorities locate the absent parent. If the custodial parent never receives a support payment, he or she will be able to rely on continuing assistance from the government.
 
 
 42
 The AFDC program is also intended to serve the purposes of the Omnibus Budget Reconciliation Act (OBRA), 45 C.F.R. § 233.20(a)(3)(ii)(d) (1990). OBRA was designed to husband and, hopefully, reduce the outlay of federal dollars targeted for social programs. OBRA amended the prior lump sum provisions under AFDC such that the receipt of a lump sum is considered income in the month it is received. OBRA did not eliminate the distinction between income and available income.
 
 
 43
 The Secretary's policy undermines the aim of the OBRA several ways. By terminating payments prematurely, the government incurs the administrative costs of terminating, reinstating and refunding benefits. Were the State to perform a "best estimate" review in order to determine whether benefits should be terminated, it would often avoid the administrative costs of reinstatement and refunding benefits. Performing "best estimate" reviews thus assists the children of the unemployed and working poor and prevents needless debt incurment by the government. Also, as noted above, such arbitrary and capricious termination of benefits needlessly incurs administrative expenses, promotes reliance on AFDC payments and discourages the working poor from contributing to their children's support. In order that denial of benefits be legitimate and not contrary to the plain language of the enabling statute, and implicit congressional intent, cancellation may not occur unless it is indicated by the results of a best estimate of the likelihood of continuation of support payments.
 
 
 44
 The applicable implementing regulations, promulgated by HHS, provide in relevant part that "income and resources are considered available both when actually available and when the applicant has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance." 45 C.F.R. § 233.20(a)(3)(ii)(D) (1990) (emphasis added).[8] Although we must endeavor to defer to the agency interpretation of its statutory authority, the Supreme Court has invalidated agency interpretations that violate the actual availability principle. See, e.g., King, 392 U.S. at 319-20, 88 S.Ct. at 2134-35. The majority states that the Social Security Act "does not preclude HHS from exempting child support from the best estimate rule." Maj.Op. at 511. Even if this be true, HHS is bound by its own regulations as well as the enabling statute to evaluate need based on actually available income. Yet its recent policy contradicts the spirit of the Act and directly contradicts the availability principle set out by the Supreme Court in Turner.
 
 
 45
 HHS regulations require a determination of the availability of child support based on income actually available in the collection month and other relevant circumstances. HHS's policy of counting the entire collection as actually available income and making a determination based on that amount alone violates the availability principle as set out in Turner and HHS's own section 302.51(b). Section 233.33(a) states that the "agency shall establish eligibility based on its best estimate of income and circumstances which will exist ..." (emphasis added). Section 233.33(b) merely refers us to section 232.20(a) for an explanation of how and when child support payments are to be considered income.[9]
 
 
 46
 Accordingly, section 232.20(b)(1) provides in pertinent part as follows:
 
 
 47
 In determining whether a support collection made by the State's IV-D agency ... is sufficient to make the family ineligible for an assistance payment for the month to which the redetermination applies, the State will determine if such collection, when treated as if it were income, makes the family ineligible for an assistance payment.
 
 
 48
 (Emphasis added).
 
 Section 232.20(a) states:
 
 49
 (a) Definition. For purposes of this section, notwithstanding any other regulations in this chapter, support collections, monthly collections and support amounts for a month mean the assigned amount that the support enforcement agency collects from an absent parent or spouse on a monthly support obligation, less the disregarded sum under § 305[sic].51(b)(1).
 
 
 50
 Section 232.20(a) does not specifically except child support from the "actual availability" calculus.
 
 
 51
 Section 232.20 refers us to section 302.51(b)(1) which states in pertinent part:
 
 
 52
 Of any amount that is collected in a month which represents payment of the required support obligation for that month, the first $50 of such amount shall be paid to the family. This payment may not be used in determining the amount paid, if any, to the family in paragraph (b)(3) of this section. If the amount collected includes payment on the required support obligation for a previous month or months, the family shall only receive the first $50 of the amount which represents the required support obligation for the month in which the support was collected.
 
 
 53
 Section 302.51(b)(1), too, does not specifically except child support from the "best estimate" calculus.[10]
 
 
 54
 I respectfully submit that a close reading of all of the interrelated regulations requires that 1) a best estimate be made based on the amount of support actually available to the AFDC family; and 2) that best estimates take into account, not only income, but "other relevant circumstances " pursuant to 42 U.S.C. § 602(a)(13)(A).[11]
 
 
 55
 The majority says it questions the wisdom of Congress's determination that a potential annual savings of less than four million dollars justifies the likely hardship to needy families who cannot reasonably rely on receipt of a child support payment in their first month of ineligibility. It nonetheless affirms the mistaken conclusion of the district court--that the policy in question was promulgated by Congress and that it was therefore up to the democratic process, and not the courts, to rectify the situation. The policy in question has not been made by Congress. It has been made by the Department of Health and Human Services. It produces effects which are destructive of congressional goals. HHS's determination is arbitrary, capricious, and runs contrary to the enabling legislation. Under the circumstances presented in this case and in light of the several congressional goals cited herein, HHS's determination is owed no deference.
 
 
 
 *
 The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed
 
 
 [1]
 The record does not indicate the reason for, and Zeien does not challenge, the AFDC cancellation in September 1987
 
 
 [2]
 Pursuant to 45 C.F.R. § 302.51, the CSC distributed the $1,040 child support payment made in April 1988 as follows:
 Distribution Explanation
 $50 to Zeien 45 C.F.R. § 302.51(b)(1) requires that the family receive the
 first $50 of any amount collected representing the required
 support obligation for that month.
$490 to IDHS 45 C.F.R. § 302.51(b)(2) requires the state to reimburse itself
 for the AFDC already paid for the month in which the support
 was collected.
$60 to Zeien 45 C.F.R. § 302.51(b)(3) requires that any excess remaining be
 paid to the family up to the difference between the AFDC
 payment for the month and the court-ordered amount for the
 month ($600 - $490 = $110, less $50 already distributed under §
 302.51(b)(1) = $60).
$440 to IDHS 45 C.F.R. § 302.51(b)(4) requires the state to retain any excess
 remaining after the first three distributions as reimbursement
 for any AFDC benefits paid in past months for which the state
 has not yet been reimbursed.
 
 
 [3]
 The eligibility ceiling excludes from the $1,000 valuation the family home, one automobile, and one burial plot for each family member. 42 U.S.C. § 602(a)(7)(B) (1988)
 
 
 [4]
 The dissent concludes that it is irrational to base AFDC ineligibility on receipt of a single child support payment and a presumption that such payments will continue, because "child support payments, even if they were to continue, would not go to the custodial parent but to the government to pay for prior assistance." This speculation ignores the regulations. Section 302.51(e) provides:
 [W]henever a family ceases to receive assistance under the [state AFDC] plan, the [state child support collection] agency must:
 (1) Continue to provide all appropriate [child support collection] services for a period not to exceed three months from the month following the month in which the family ceased to receive assistance under the [state AFDC] plan. The State may not charge fees or recover costs from support collections and must pay all amounts collected which represent monthly support payments to the family[.]
 
 
 [45]
 C.F.R. § 302.51(e)(1) (1990) (emphasis added)
 
 
 [5]
 Under the district court's order, Zeien has since received a corrective AFDC payment for June 1988
 
 
 [6]
 The dissent emphatically reminds us that we are reviewing HHS regulations rather than an act of Congress. The HHS regulations that directly prevented Zeien from receiving any income in the month of June 1988 are 45 C.F.R. §§ 302.32(b) and 302.51(b)(2). HHS amended these regulations to conform with 42 U.S.C. § 654(5), the TEFRA amendment to the Social Security Act designed to eliminate the possibility of AFDC families receiving both child support and the AFDC payments for the same month. The intent behind these HHS regulations thus is that of Congress, not the HHS. Congress made the policy decision that the possibility of double payments to AFDC recipients for a single month was an evil greater than the possibility of no payments at all. HHS simply implemented that policy decision, as 42 U.S.C. § 654(5) required it to do
 
 
 [1]
 According to the record, IDHS approximates that 200 families each year are affected by the state's policy resulting in no support payments being made following cancellation of AFDC benefits
 
 
 [2]
 A corrective payment in a subsequent month is hardly a solution for a family who has been evicted the month before
 
 
 [3]
 The majority's opinion relies on Bowen v. Gilliard, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987), for the proposition that Congress must decide whether the cost savings of the HHS child support policy outweighs the hardship the policy inflicts on the needy. This court is not reviewing an Act of Congress, it is reviewing the agency rules and policy dictated to fill the gaps in congressional legislation
 
 
 [4]
 Maintenance of the family's structure is the paramount purpose of the federal program granting aid for the care of dependent children. Ramos v. Montgomery, 313 F.Supp. 1179 (S.D.Cal.), aff'd at 400 U.S. 1003, 91 S.Ct. 572, 27 L.Ed.2d 618 (1970)
 
 
 [5]
 In 1982, Congress amended 42 U.S.C. § 454(5) to provide that the support payments causing ineligibility not be paid the family. The Conference Committee explained the purpose of the amendment:
 The Senate amendment [which was adopted] requires that amounts collected which are sufficient to make the family ineligible will be paid to the family in months after the first month of ineligibility. This would allow the State to reimburse itself for AFDC that would have already been paid for that month, before the support was collected and known to have made the family ineligible. Thus, the family would not receive double payment for the same month, once in the form of AFDC, and once as a result of the child support collection.
 H.R.Conf.Rep. 97-760, 97th Cong.2d Sess. 453 (1982), 1982 U.S.Code Cong. & Admin.News 1233 (emphasis in original). Congress made no provision for the first month of ineligibility where support did not continue.
 
 
 [6]
 The government urges that even if the "best estimate" rule would follow, the fact that support payments must be paid to the state and not the custodial parent does not solve potential hardship in the first month of ineligibility. This misses the point. The fact that the government receives the payments directly, to avoid double payments, provides exact knowledge of whether the funds are sufficient to repay overdue obligations and to examine the circumstances which would govern the likelihood of continued payments. Moreover, even though errors might be made and payment denied despite the use of the "best estimate" calculus, it is clear that error would result in far fewer cases than under the present procedure
 
 
 [7]
 HHS, however, has acknowledged that "child support obligations are not always met in a timely and responsible manner." (Appellee's Brief at 16, n. 12.)
 
 
 [8]
 The Ninth Circuit came to a similar conclusion in Schrader v. Idaho Department of Health & Welfare, 768 F.2d 1107 (9th Cir.1985). The court considered a state AFDC regulation that counted the value of the recipient's real property as available assets even if the recipient was unable to sell the property despite a good faith effort to do so. In finding the regulation contrary to the Social Security Act, the court stated that the issue was not whether the Social Security Act requires the state to give the recipient a grace period to sell the property before disqualification from the program. The issue was whether the state regulation satisfied the availability requirement. Id. at 1112. If real property is not considered available to the recipient even when the recipient has full control over the property, it follows that child support payments may be found unavailable when the recipient has no control at all over the flow of that income
 
 
 [9]
 Clearly, section 233.33(b) and section 302.51(b)(1) exist to provide a specific calculus for determining a family's actually available income--the only type of income which may legitimately be considered when determining a family's need. It states that $50 of the amount collected is to be given to the family and not considered income. The remaining monies, even if they are considered income to the family, are processed under the other provisions of section 302.51(b), which provide, among other things, for the reimbursement of the government for any assistance payments made to the family for the present month past months. Thus, section 302.51(b) provides a definite mechanism for determining what portion of a child support collection is to be considered actually available income. Therefore, child support payments are not excluded from the actual availability principle
 
 
 [10]
 The regulations provide that "all types of income will be taken into consideration in the same way except where otherwise specifically authorized by Federal statute...." 45 C.F.R. § 233.20(a)(1) (emphasis added)
 
 
 [11]
 Consideration of "other relevant circumstances" indicates Congress's intent to base eligibility on a realistic appraisal or "best estimate" of the family's resources