(Slip Opinion)

# Whether the United States Postal Service Bears Responsibility for the Cost of Certain Civil Service Retirement Benefits Paid to Its Employees

The United States Postal Service is responsible for the full cost of retirement benefits owed to its employees under the Civil Service Retirement System attributable to pay increases that USPS granted on and after the date it was established, including with respect to increases in benefits accrued during those employees' years of service at USPS's predecessor, the Post Office Department.

March 26, 2024

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF PERSONNEL MANAGEMENT

In 1970, Congress abolished the Post Office Department ("POD") and replaced it with the United States Postal Service ("USPS"). Postal Reorganization Act, Pub. L. No. 91-375, 84 Stat. 719 (1970); *see* 39 U.S.C. § 201. POD employees, like most other federal employees at the time, participated in the Civil Service Retirement System ("CSRS"), a defined-benefit pension plan. *See* 5 U.S.C. § 8331 *et seq.* You have asked us whether USPS is "required to pay the full cost" of CSRS benefits "attributable to pay increases" on and after the date USPS was established, for USPS employees who also accrued CSRS benefits through service with POD. Letter for Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, from Webb Lyons, General Counsel, Office of Personnel Management ("OPM") at 1 (Feb. 22, 2023) ("OPM Letter"). For the reasons explained below, we conclude that USPS is so required.

## I.

### A.

The U.S. Government calculates CSRS benefits using two factors: employees' years of creditable federal service, and their "high-three" salary—meaning their average pay during the three consecutive years of employment when they were highest paid. 5 U.S.C. § 8339; *see id.* § 8331(4). Specifically, employees covered by CSRS get an annual pension equal to their high-three salary multiplied by an amount established

by statute, which for most employees is 1.5 percent for the first five years of employment, 1.75 percent for the next five, and 2 percent after that. *Id.* § 8339(a).

This formula helps explain the stakes of the dispute over who must pay the cost of CSRS benefits "attributable to [post-1971] pay increases." OPM Letter at 1. When USPS grants a pay increase to an employee who previously worked at POD and that pay increase sets a new high-three salary, that high-three salary applies to all the employee's years of service, including at POD. Consider a hypothetical employee who worked for the federal government for 30 years—15 at POD and 15 at USPS—whose high-three salary was $19,165 at POD and $30,000 at USPS.[1] Thanks to the USPS-granted pay raises, the employee's high-three salary would be $30,000 for all their years of service, including the 15 years at POD, and the employee would receive an annual benefit of $16,875.[2]

Significant financial implications flow from the method of allocating responsibility between USPS and POD for the greater pension costs resulting from USPS-granted pay raises. One approach would be to make USPS responsible for the entire cost of the pay raise, including any increase resulting from the higher pay being applied to the years of service at POD. This approach can be implemented via what is known as the "frozen benefit" methodology, which identifies the "frozen benefit" an employee would have earned had they retired the day POD ceased to exist (June 30, 1971) and makes USPS responsible for the remainder. Applying that approach to our hypothetical employee, POD would be responsible for just under $5,031 of the annual benefit,[3] and USPS would be responsible for the remaining $11,844.

---

[1] These amounts assume that the employee had an overall high-three salary of $30,000 and received a 3.25 percent raise every year between their start date at USPS (July 1, 1971) and retirement 15 years later. *See* Hay Group, *U.S. Postal Service: Evaluation of the USPS Postal CSRS Fund for Employees Enrolled in the Civil Service Retirement System* at 9 (Jan. 11, 2010).

[2] This annual pension is equal to $30,000 multiplied by the statutory amounts noted in the text—specifically, $2,250 for the first five years of service at POD (5 x 0.015 x $30,000); $2,625 for the second five years of service at POD (5 x 0.0175 x $30,000); $3,000 for the final five years of service at POD (5 x 0.02 x $30,000); and $9,000 for the 15 years of service at USPS (15 x 0.02 x $30,000).

[3] This annual pension is equal to $19,165, the hypothetical employee's high-three salary at POD, multiplied by the statutory amounts noted in the text—specifically, $1,437.38

An alternative approach, known as the "service ratio" approach, would split the costs of USPS-granted pay raises according to the "percentage of civilian service before and after July 1971." Letter for Kay Cole James, Director, OPM, from Richard J. Strasser, Jr., Chief Financial Officer & Executive Vice President, USPS, *Re: Postal Service Comments and Request for Reconsideration of OPM Draft Plan for Computation of Amounts Saved Under Public Law 108-18*, at 2 (July 22, 2003) ("2003 Strasser Letter"). Using this approach, USPS would be responsible for half of our hypothetical employee's retirement benefit—$8,437.50—because the employee spent half their career at USPS. Other allocations are also possible. But the "frozen benefit" and "service ratio" approaches helpfully frame the leading options and demonstrate the significance of the choice.

Funding for CSRS benefits comes from two main sources: pay deductions, 5 U.S.C. § 8334(a)(1)(A), (c), and agency matching contributions, *id.* § 8334(a)(1)(B)(i). These amounts go into the Civil Service Retirement and Disability Fund ("Fund"), where they earn interest—which also becomes part of the Fund. *See id.* §§ 8334(a)(2), 8348. But these sources typically do not cover the full cost of benefits, *see, e.g.*, OPM, *Civil Service Retirement and Disability Fund Annual Report: Fiscal Year Ended September 30, 2021*, at 25 (Mar. 2022), with the shortfall known as the "unfunded liability," 5 U.S.C. § 8331(19). In technical terms, the unfunded liability is the amount by which the present value of all future benefits that must be paid exceeds the current Fund balance, plus the present value of expected future employee deductions and future employer contributions. *Id.* For USPS employees, this unfunded liability is "attributable mainly to increases in future CSRS benefits that result from" pay raises and cost of living adjustments ("COLAs"). Patrick Purcell & Nye Stevens, Cong. Research Serv., RL31684, *Funding Postal Service Obligations to the Civil Service Retirement System* at 3 (updated Mar. 28, 2003) ("2003 CRS Report").

---

for the first five years of service at POD (5 x 0.015 x $19,165); $1,676.94 for the second five years of service (5 x 0.0175 x $19,165); and $1,916.50 for the final five years of service (5 x 0.02 x $19,165).

**B.**

Although the Postal Reorganization Act allowed former POD employees to continue to participate in CSRS, it did not resolve the consequential question of how to allocate responsibility for the retirement benefits attributable to pay increases granted by USPS to former POD employees. *See* OPM Letter at 5. Since then, however, Congress has enacted three key statutes relevant to that issue.

**1.**

Congress first addressed the issue in 1974, when it enacted a provision that expressly made USPS responsible for increases in CSRS's unfunded liability attributable to pay increases USPS granted to its employees:

> Notwithstanding any other statute, the United States Postal Service shall be liable for that portion of any estimated increase in the unfunded liability of the Fund which is attributable to any benefits payable from the Fund to active and retired Postal Service officers and employees, and to their survivors, when the increase results from an employee-management agreement under title 39, or any administrative action by the Postal Service taken pursuant to law, which authorizes increases in pay on which benefits are computed.

Pub. L. No. 93-349, § 1, 88 Stat. 354, 354 (1974) ("1974 Act"). The 1974 Act made these provisions retroactive to July 1, 1971—the date USPS was established—but reimbursed USPS for the portion of the unfunded liability incurred during its first three years. *Id.* § 3. The 1974 Act also tasked OPM's predecessor, the Civil Service Commission, with estimating USPS's liability as a result of the 1974 Act and required USPS to pay that amount in 30 equal annual installments. *Id.* § 1.

USPS and OPM agree that the 1974 Act made USPS fully responsible for any increases in CSRS benefits attributable to USPS actions that increased its employees' pay. *See* Letter for Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, from Thomas J. Marshall, General Counsel & Executive Vice President, USPS at 3 (June 28, 2023) ("USPS Letter"); OPM Letter at 6. They agree, too, that this responsibility included increases in benefits that *also* related to USPS employees' years at POD. *See* USPS Letter at 3; OPM Letter at 6.

USPS recognized at the time that the 1974 Act shifted "enormous costs" onto it. Letter for Thaddeus J. Dulski, Chairman, Committee on Post Office & Civil Service, U.S. House of Representatives, from Louis A. Cox, General Counsel, USPS (Mar. 27, 1973), *reprinted in* H.R. Rep. No. 93-120, at 9 (1973). Yet USPS supported the legislation. *Id.* As USPS's General Counsel explained, "[a]fter careful consideration—and in full awareness of the financial burdens enactment of the bill will impose—the Postal Service has concluded that it is proper, as a matter of principle, for these costs to be imposed on postal ratepayers rather than the taxpayers." *Id.* The "principle of postal self-sufficiency," he stated, "calls for those who use postal services to bear the costs of those services." *Id.* at 10.

Consistent with this principle, in a series of statutes adopted between 1989 and 1993, Congress imposed additional costs on USPS by making USPS responsible for COLAs paid to former employees who were CSRS beneficiaries, retroactive to the date USPS was established. *See* 2003 CRS Report at 4 & n.10 (listing statutes). Congress made these changes because it concluded that requiring the Department of the Treasury ("Treasury") to pay for these costs improperly "subsidized" costs that were properly allocated to USPS. *See* H.R. Rep. No. 100-656, pt. 1, at 12–13 (1988).

## 2.

Beginning in the 1990s, USPS's financial status deteriorated, and by the early 2000s, financial concerns about USPS had become acute. *E.g.*, Gen. Acct. Office, GAO-01-598T, *U.S. Postal Service: Transformation Challenges Present Significant Risks* (Apr. 4, 2001). The Senate Committee on Governmental Affairs thus asked the General Accounting Office ("GAO")[4] to review USPS's finances. 2003 CRS Report at 4. In turn, GAO asked OPM to determine whether USPS "was paying more or less than appropriate to cover payments for [CSRS] for which it [was] responsible." H.R. Rep. No. 108-49, at 5 (2003).

---

[4] In 2004, GAO's name was changed from the General Accounting Office to the Government Accountability Office. *See* GAO Human Capital Reform Act of 2004, Pub. L. No. 108-271, § 8, 118 Stat. 811, 814. We use the acronym "GAO" to refer to both entities.

In November 2002, OPM's analysis brought "good financial news" to USPS: USPS would eventually overfund its CSRS liability "by approximately $71 billion" over the lifetime of the program—although no overfunding had "occurred to date," and about "$20.5 billion in future benefits remain[ed] to be funded." Letter for John E. Potter, Postmaster General, from Kay Coles James, Director, OPM at 1–3 (Nov. 1, 2002) ("2002 James Letter"). The overfunding was due to several factors, including that the Fund had earned "excess interest"—i.e., interest "in excess of the 5 percent that was assumed under the" statute. S. Rep. No. 108-35, at 3 (2003).

In reaching these conclusions, OPM used the frozen benefit methodology described above. *See* Report on Methodology for Postal Service Funding Study (July 31, 2003) ("Methodology Report"), *reprinted in Continuing to Deliver: An Examination of the Postal Service's Current Financial Crisis and Its Future Viability: J. Hearing Before the H. Subcomm. on Fed. Workforce, Postal Serv., & D.C. & the H. Comm. on Oversight & Gov't Reform*, 111th Cong. 262–63 (2010) ("*Continuing to Deliver*"). This methodology was then reviewed by the Board of Actuaries for the Fund, staff at Treasury and the Office of Management and Budget ("OMB"), and GAO. *See* 2002 James Letter at 2; GAO, *United States Postal Service: Review of the Office of Personnel Management's Analysis of the United States Postal Service's Funding of Civil Service Retirement System Costs: Briefing for Congressional Requesters* at 42–55 (Jan. 30, 2003) ("2003 GAO Analysis"). The Board "agreed with [OPM's] findings," and Treasury and OMB "concurred." 2002 James Letter at 2. And while GAO disagreed with some of OPM's assumptions, it reviewed and did not question OPM's "methodologies for allocating estimated benefit payments and other expenses between service rendered before and after July 1, 1971—the effective date of the Postal Reorganization Act." 2003 GAO Analysis at 53.

To address the impending overfunding, OPM drafted—and staff at OMB, Treasury, and USPS reviewed—a proposal that became the Postal Civil Service Retirement System Funding Reform Act of 2003, Pub. L. No. 108-18, 117 Stat. 624 ("2003 Act"). *See* 2002 James Letter at 1; *see also* 2003 CRS Report at 8–9. The 2003 Act aimed to ensure that USPS was only paying for the costs of CSRS benefits for "which it is responsible," H.R. Rep. No. 108-49, at 5, and it did so by adopting a two-pronged

approach modeled after the Federal Employees' Retirement System ("FERS"), i.e., the retirement system for most federal employees hired after December 31, 1983. Federal Employees' Retirement System Act of 1986, Pub. L. No. 99-335, 100 Stat. 514 (codified as amended at 5 U.S.C. § 8401 *et seq.*); *see* GAO, GAO-12-146, *U.S. Postal Service: Allocation of Responsibility for Pension Benefits Between the Postal Service and the Federal Government* at 29 (Oct. 2011) ("2011 GAO Report").

In the first prong, the 2003 Act changed the way USPS funded its matching contributions (for employees who were still paying into CSRS) to the method used by FERS, which makes more accurate assumptions about the full cost of benefits, "includ[ing] the effects of employee pay raises and retiree cost-of-living-adjustments." 2003 CRS Report at 4; *see* 5 U.S.C. § 8423(a); 2002 James Letter at 2. Specifically, the Act required USPS to make contributions pegged to the "normal-cost percentage" for relevant employees, minus the amount deducted from employees' pay. 2003 Act § 2(b)(1). The Act defined "normal-cost percentage" as the "entry-age normal cost computed by [OPM] in accordance with generally accepted actuarial practice and standards (using dynamic assumptions) and expressed as a level percentage of aggregate basic pay." *Id.* § 2(a)(1) (codified at 5 U.S.C. § 8331(17)). And the Act defined "dynamic assumptions" as "economic assumptions that are used in determining actuarial costs and liabilities of a retirement system and in anticipating the effects of long-term future—(A) investment yields; (B) increases in rates of basic pay; and (C) rates of price inflation." *Id.* § 2(a)(3) (codified at 5 U.S.C. § 8331(29)). As amended by the 2003 Act, USPS's matching contributions thus took account of "the effects of future employee pay raises and retiree COLAs." S. Rep. No. 108-35, at 2. Because of these changes, the existing provisions that required USPS to make separate payments to cover CSRS costs attributable to pay raises and COLAs were "no longer . . . necessary," and the 2003 Act repealed these provisions. *Id.*; *see* 2003 Act § 2(c), (d).

In the second prong, the 2003 Act established a "Postal supplemental liability," modeled after a similar aspect of FERS, which required USPS to make deposits for "any retirement costs not covered by past or future [USPS] or employee payments." S. Rep. No. 108-35, at 6–7; *see* 2002 James Letter at 2. The Act defined the Postal supplemental liability as the "actuarial present value of all future benefits payable from the Fund" that

are "attributable to the service of current or former employees of the [USPS]," minus the present value of all CSRS revenues that USPS and its employees could be credited with—namely, (1) the "actuarial present value" of deductions to be withheld from the future pay of USPS employees and "future contributions" to be made by USPS; (2) the portion of the Fund balance "attributable to payments to the Fund by [USPS] and its employees, including earnings on those payments"; and (3) "any other appropriate amount, as determined by [OPM] in accordance with generally accepted actuarial practices and principles." 2003 Act § 2(c).

The Congressional Budget Office ("CBO") estimated that the 2003 Act would save USPS between $3 and $5 billion a year. H.R. Rep. No. 108-49, at 7. OPM, again using the frozen benefit methodology to calculate the financial impact on USPS, put that amount at between $2.5 and $2.9 billion a year, or about $78 billion overall. *See* 2002 James Letter at 2; Methodology Report, *reprinted in Continuing to Deliver* at 259–60, 262–63; S. Rep. No. 108-35, at 2–3.

The 2003 Act also made one change that increased USPS's costs: It made USPS either wholly or partially responsible for CSRS costs attributable to the "military and volunteer service (i.e.[,] Peace Corps, VISTA, etc.)" of its employees. S. Rep. No. 108-35, at 7; *see* 2003 Act § 2(c). This decision represented a departure from the way FERS operates, under which Treasury is responsible for these costs. *See* 2003 CRS Report at 8. And it sparked controversy. Some Members of Congress thought it "unfair to make postal customers and ratepayers fund military retirement benefits." 149 Cong. Rec. 8795 (2003) (statement of Rep. Tom Davis). As a result, Congress instructed USPS, Treasury, and OPM to each submit a report detailing "whether and to what extent" Treasury or USPS should be responsible for these benefits. 2003 Act § 2(e)(1).

### 3.

Discussion of USPS's financial condition continued. The 2003 Act directed OPM to submit a report detailing its methodology to compute the savings that would accrue to USPS from the 2003 Act. *See* 2003 Act § 3(b). In July 2003, OPM submitted its report, reaffirming that its November 2002 analysis had used the frozen benefit methodology and emphasizing that, going forward, it would continue to do so. Methodology Report, *reprinted in Continuing to Deliver* at 259–61.

USPS objected, arguing that the frozen benefit methodology assigned an "unreasonable portion of the benefit to be paid" to USPS. 2003 Strasser Letter at 1. USPS asked OPM to reconsider and proposed instead using the service ratio method, which USPS estimated would save it $86 billion. Letter for Board of Actuaries, CSRS, from John E. Potter, Postmaster General at 2 (Jan. 26, 2004) ("2004 Potter Letter"). OPM rejected USPS's request. *Id.*

USPS also asked the CSRS Board of Actuaries to review OPM's methodology. *See id.* at 1. The Board "reconsidered in detail" OPM's methodology and concluded that it was the "most appropriate way to determine [USPS's] obligations." Letter for Ronald P. Sanders, Associate Director for Strategic Human Resources Policy, OPM, from Douglas C. Borton, Chairman, Board of Actuaries, CSRS at 1 (Aug. 18, 2004). The Board also "confirm[ed] [its] prior finding that this method clearly follows the intent of Congress." *Id.*

Meanwhile, Congress continued to hear testimony and receive reports from experts and others detailing additional proposals that could shore up USPS's finances. *Answering the Administration's Call for Postal Reforms—Parts I, II, and III: Hearings Before the Special Panel on Postal Reform & Oversight of the H. Comm. on Gov't Reform*, 108th Cong. (2004). Several witnesses asked Congress to take "action to clean up the misallocation of billions of dollars" by changing the "allocation methodology for retirement benefits earned by USPS workers before 1971." *Id.* at 410 (statement of Gary M. Mulloy, Chairman & CEO of ADVO, Inc.), *see also, e.g.*, *id.* at 133–34 (statement of William Burrus, President of American Postal Workers Union, AFL-CIO). Other witnesses testified about whether to continue to make USPS responsible for CSRS costs attributable to its employees' military service. *See, e.g.*, *id.* at 41–42 (statement of Postmaster General John E. Potter); *id.* at 73, 106 (statement of Comptroller General David M. Walker). As required by the 2003 Act, *see* 2003 Act § 2(e), Congress also received separate reports on the allocation of military retirement benefits from OPM (joined by Treasury), USPS, and GAO. *See* OPM & Treasury, *Report to Congress on the Financing of Benefits Attributable to the Military Service of Current and Former Employees of the Postal Service* (2003); USPS, *Postal Service Proposal: Military Service Payments Requirements, P.L. 108-18* (2003);

GAO, GAO-04-281, *Postal Pension Funding Reform: Review of Military Service Funding Proposals* (Nov. 2003).

Ultimately, in 2006, Congress adopted further reforms. *See* Postal Accountability and Enhancement Act, Pub. L. No. 109-435, 120 Stat. 3198 (2006) ("2006 Act"); H.R. Rep. No. 109-66, pt. 1, at 43–45 (2005). These reforms included adopting one pension-related recommendation from the 2004 hearings: Congress eliminated the provision of the 2003 Act that directed OPM to include the costs of CSRS benefits attributable to USPS's employees' military service, by amending the "Postal supplemental liability"—renamed the "Postal surplus or supplemental liability"—to make USPS responsible for only CSRS costs "attributable to" its employees' "*civilian* employment with [USPS]." 2006 Act § 802(a)(2) (emphasis added).

These changes resulted in an "immediate overfunding of [USPS's] portion of the CSRS Fund" of about $20.3 billion. H.R. Rep. No. 109-66, pt. 1, at 69, 82. To remedy this overfunding, Congress "terminate[d] the Postal Service's obligation to make CSRS [matching] contributions." *Id.* at 69; *see* 2006 Act § 802(a)(1). The 2006 Act did not, however, address the other pension-related issue that had featured at the 2004 hearings: OPM's decision to use the frozen benefit methodology in calculating the Postal supplemental liability.

## C.

Since 2006, debate has continued over the allocation of responsibility for the retirement benefits of former POD employees who continued with USPS. In January 2010, USPS's Office of Inspector General ("USPS-OIG") commissioned a report reviewing the allocation of CSRS liabilities between USPS and Treasury. *See* USPS-OIG, *The Postal Service's Share of CSRS Pension Responsibility* (Jan. 20, 2010) ("USPS-OIG Report"). In USPS-OIG's view, the report showed that the frozen benefit methodology "assigned an unfair share of CSRS liabilities" to USPS. *Id.* at 3. USPS-OIG estimated that if OPM had used the service ratio method, USPS would receive credit for another $75 billion as of 2009. *Id.* at 3; *see also* Hay Group, *U.S. Postal Service: Evaluation of the USPS Postal CSRS Fund for Employees Enrolled in the Civil Service Retirement System* at 2, 18–21 (Jan. 11, 2010).

The USPS-OIG Report "quickly sparked interest on Capitol Hill." Michael Schuyler, Institute for Research on the Economics of Taxation, *Congressional Advisory: Does the U.S. Treasury Owe $75 Billion to the Postal Service?* at 2 (Mar. 14, 2011). Some legislators likened USPS-OIG's claim "to finding a winning lottery ticket," while others "forcefully expressed opposition." *Id.* at 2, 3. Several legislators introduced bills that would have precluded OPM from using the frozen benefit methodology, including a House measure that attracted 144 co-sponsors. *See* H.R. 5746, 111th Cong. § 2 (2010); *see also* S. 3831, 111th Cong. § 2 (2010); S. 4000, 111th Cong. § 101(a) (2010). Congress did not adopt any of them.

In April 2010, Congress held another hearing about USPS's finances, and the frozen benefit methodology arose again. OPM's Director of Planning and Policy Analysis stated that it was "clear that Congress had no intention to absolve the Postal Service for increases in retirement costs due to pay increases" when it adopted the 2003 Act, "but rather that Congress understood that the inclusion of such costs was an inherent aspect of the funding mechanism it had established." *Continuing to Deliver* at 180 (statement of John O'Brien, Director of Planning & Policy Analysis, OPM). He explained that while adopting USPS's service ratio method "may be worthy of future consideration by the Congress," OPM "believe[d] that it [was] not possible based upon current legislation." *Id.* at 178.

In June 2010—consistent with procedures created in the 2006 Act, *see* 2006 Act § 802(c)(1)—the Postal Regulatory Commission submitted an independent actuarial report authored by The Segal Company to Congress, OPM, and USPS. Letter for John Berry, Director, OPM, from Ruth Y. Goldway, Chairman, Postal Regulatory Commission (June 30, 2010), enclosing The Segal Group, Inc., *Report to the Postal Regulatory Commission: Civil Service Retirement System Cost and Benefit Allocation Principles* (June 29, 2010) ("Segal Report"). The report stated that both the frozen benefit and service ratio methodologies were "within the range of acceptable allocations." Segal Report at 2. It also suggested yet another methodology—the "benefit accrual" methodology—which it stated would be "fair and equitable." *Id.* at 14.[5] Using this methodology, the Segal

---

[5] Under the benefit accrual methodology, the employing agency's contribution is equal to the overall high-three salary across all of an employee's federal service multiplied by

Report estimated that USPS had overfunded CSRS by $50–$55 billion as of 2010. *Id.* at 13.

OPM reconsidered its use of the frozen benefit methodology in light of the Segal Report, as required by another provision of the 2006 Act. *See* Letter for Ruth Y. Goldway, Chairman, Postal Regulatory Commission, from John Berry, Director, OPM (Sept. 24, 2010). OPM declined to modify its methodology, in a letter copied to the relevant congressional committees. *Id.* at 4. OPM stated that it "d[id] not have the authority to make a reallocation in the manner suggested by the Segal report." *Id.* And a few months later, OPM's Office of the Inspector General ("OPM-OIG") concurred in OPM's view: OPM-OIG stated that the service ratio and benefit accrual methodologies would "involve a radical revision" to Congress's allocation decisions, and that it would be "highly inappropriate for the OPM to unilaterally make such a decision without a clear statutory direction from Congress." OPM-OIG, *A Study of the Risks and Consequences of the USPS OIG's Proposals to Change USPS's Funding of Retiree Benefits* at 32–33 (Feb. 28, 2011) (emphasis omitted).

Congressional committees then asked GAO to examine whether OPM's methodology was "consistent with the law." 2011 GAO Report at 2. GAO found it was. *Id.* at 6–9. GAO reasoned that while the 2003 Act required OPM to "change the funding *methodology* for USPS," it did not "change the underlying *allocation* of benefit responsibility between USPS and the federal government." *Id.* at 8. GAO also examined the proposals to use the service ratio methodology or benefit accrual methodology. *Id.* at 9–19. GAO concluded that "[a]ll three" fell "within the range of reasonable

---

the statutory rate for the years the employee spent at the agency (i.e., 1.5 percent for the first five years of employment, 1.75 percent for the next five, and 2 percent after that, *see* 5 U.S.C. § 8339(a)). Compared with OPM's frozen benefit methodology, USPS's expected contributions would be less under the benefit accrual methodology. That is because the benefit accrual methodology assumes that POD (and thus Treasury) will cover the costs of benefit increases attributable to all pay increases, even those that USPS is responsible for (that is, the methodology would attribute to our hypothetical employee a $30,000 high-three salary as to employment at POD, even though the employee only earned this amount at USPS). Compared with USPS's service ratio methodology, USPS's expected contributions would be more under the benefit accrual methodology. That is because former POD employees typically accrued greater benefits during their years at USPS owing to the fact that they were at USPS in later stages of their careers. *See supra* Part I.A.

actuarial methods." *Id.* at 14. But GAO emphasized that the decision of which methodology to use was a "policy choice" and that, in its view, Congress had required OPM to use the frozen benefit methodology. *Id.* at 9. GAO also noted that using a different methodology would "result in a significant transfer of pension costs"—between $56 and $85 billion—"to the federal government and thereby to taxpayers." *Id.* at 2, 9, 10.

GAO's report did not end Congress's involvement with USPS's finances. Since that report, OPM's use of the frozen benefit methodology has come before Congress again and again.[6] Legislators from both chambers have introduced additional bills that would have forbidden OPM from using the frozen benefit methodology, with one House measure gathering 230 co-sponsors.[7] But none have become law, while Congress has taken steps to relieve USPS of other financial responsibilities. In 2009, Congress reduced the amount that USPS must contribute to the Postal Service Retiree Health Benefits Fund under the 2006 Act from $5.4 billion, *see* 2006 Act § 803(a)(1)(B), to $1.4 billion, *see* Continuing Appropriations Resolution, 2010, Pub. L. No. 111-68, div. B, § 164(a), 123 Stat. 2023, 2043, 2053 (2009). After 2009, USPS failed to make several payments to the Postal Service Retiree Health Benefits Fund as required under the 2006 Act. H.R. Rep. No. 117-89, pt. 1, at 19 (2021). In 2022, Congress eliminated USPS's obligation to do so, as part of a package of reforms designed to help USPS "remain financially viable." *Id.* at 17; *see* USPS Fairness Act, Pub. L. No. 117-108, § 102(c)(1), 136 Stat. 1127, 1138, 1139–40 (2022).

---

[6] *See, e.g.*, Kevin R. Kosar, Cong. Research Serv., R41024, *The U.S. Postal Service's Financial Condition: Overview and Issues for Congress* at 9–11 (Jan. 27, 2012); Katelin P. Isaacs & Annie L. Mach, Cong. Research Serv., R43349, *U.S. Postal Service Retiree Health Benefits and Pension Funding Issues* at 8–10 (updated Jan. 7, 2015); USPS-OIG, *Update on the Postal Service's Share of CSRS Pension Responsibility* at 1–7 (May 7, 2018) (estimating that, as of 2016, USPS's portion of CSRS assets would have been $110.8 billion larger under the service ratio method and $79.8 billion under the benefit accrual method); *Legislative Proposals to Put the Postal Service on Sustainable Financial Footing: Hearing Before the H. Comm. on Oversight & Reform*, 117th Cong. 11, 14 (2021).

[7] *See* H.R. 1351, 112th Cong. § 2 (2011); *see also* H.R. 3174, 112th Cong. § 2 (2011); S. 1853, 112th Cong. § 101 (2011); H.R. 3591, 112th Cong. § 101 (2011); S. 1688, 112th Cong. § 3 (2011); S. 1649, 112th Cong. § 2 (2011); H.R. 630, 113th Cong. § 101 (2013); S. 316, 113th Cong. § 101 (2013).

## II.

Current law requires USPS to "pay" the "Postal . . . supplemental liability" calculated by OPM—which is based in part on what CSRS "benefits payable . . . to current or former [USPS] employees" are *attributable to* civilian employment with" USPS. 5 U.S.C. § 8348(h)(1)(A), (h)(1)(B), (h)(2)(B), (E) (emphasis added). This dispute concerns what benefits are "attributable to" USPS employment, and in particular, whether USPS is required to pay the full cost of CSRS benefits that result from pay raises that USPS granted former POD employees after it became independent. USPS Letter at 1–2. As noted at the outset, we believe USPS is so required.

### A.

As discussed above, Congress has enacted three key statutes addressing the allocation of responsibility for pay raises that USPS granted former POD employees. In all three, we believe Congress allocated to USPS the responsibility to fund the full cost of any CSRS benefits increases resulting from pay raises USPS granted to former POD employees.

### 1.

Congress first spoke to this issue in the 1974 Act, which explicitly addressed the question we have been asked to answer. That Act provided that "[n]otwithstanding any other statute," USPS "shall be liable for that portion of any estimated increase in the unfunded liability of the Fund which is attributable to any benefits payable from the Fund" to active and retired USPS officers and employees (and their survivors) when the increase resulted from USPS actions that "authorize[d] increases in pay on which benefits are computed." 1974 Act § 1. As we have explained, USPS and OPM agree that under this provision USPS bore responsibility "for the full CSRS effects of [its] employees' pay increases, including effects of those pay increases on benefits attributable to transitional employees' years with the POD." USPS Letter at 3; *see* OPM Letter at 6–7 (similar).

**2.**

Congress returned to this issue in 2003, when it repealed the provision in the 1974 Act that discussed the allocation of responsibility for pay increases and replaced the provision with a two-prong system modeled after FERS. USPS argues that these actions granted OPM "discretion to make a fresh determination regarding an appropriate allocation methodology." USPS Letter at 2. Conversely, OPM maintains that the new two-pronged system continued to require the same allocation. OPM Letter at 13. Like GAO before us, we agree with OPM. When read in context, we think the controlling text makes clear that Congress did not confer on OPM the discretion USPS claims.

We begin with the first prong of Congress's 2003 system. The text of the 2003 Act expressly changed USPS's matching contributions to specify that USPS "shall" "contribute[]" an amount based on "dynamic assumptions"—defined to include "increases in rates of basic pay" and "rates of price inflation." 2003 Act § 2(a)(1), (a)(3), (b)(1). We agree with GAO that "[b]ecause these dynamic assumptions include projections of future pay increases, the consequence of the 2003 Act was to leave the underlying 1974 allocation unchanged, notwithstanding the removal of the explicit allocation provision." 2011 GAO Report at 29. In particular, by requiring USPS to make contributions based on projected "increases in rates of basic pay," 2003 Act § 2(a)(3), without exception, this text is hard to square with USPS's position. That position posits that the 2003 Act authorized OPM to determine that USPS should *not* bear responsibility for costs associated with pay increases for USPS's former POD employees.

Moreover, the legislative history confirms that Congress understood this provision to have mooted the need for the separate payments required by the repealed 1974 Act provision. Because USPS's contributions to CSRS under the 2003 Act would "include[] the effects of future employee pay raises and retiree COLAs, the separate payments that USPS [was] required to make under [the 1974 Act] to fund the future increases in CSRS annuities that result from pay raises and COLAs would no longer be necessary." S. Rep. No. 108-35, at 2. "*Consequently*" the 2003 Act "repeal[ed] the provisions of [the 1974 Act]" expressly requiring those separate payments. *Id.* (emphasis added). Congress thus did not repeal the 1974 Act provision in order to give OPM "discretion" to set a different

allocation between USPS and Treasury, as USPS claims. USPS Letter at 2. Congress did so because it understood the 2003 Act, via a different mechanism, to continue to dictate the same allocation.

We are unpersuaded by USPS's attempt to dismiss the significance of this provision. Per USPS, the argument we have just sketched "conflates two separate concepts: the allocation of funding responsibility between Treasury and the Postal Service, and the methodology for computing [USPS's] allocated share." *Id.* at 11. But while USPS is right that those issues differ, this provision of the 2003 Act provides a rule that governs both: When it specifies that USPS contributions must include costs reflecting "increases in rates of basic pay," 2003 Act § 2(a)(3), it simultaneously dictates that USPS—rather than Treasury—is responsible for those amounts and provides a methodology for computing USPS's share.

The second prong of Congress's 2003 system—the Postal supplemental liability—also did not confer on OPM the discretion that USPS claims. That provision states that the Postal supplemental liability is "the actuarial present value of all future benefits . . . attributable to the service of current or former employees of the United States Postal Service"—i.e., the cost of the CSRS benefits owed—minus the amount of CSRS revenues credited to USPS and its employees, which included the present value of future pay deductions and contributions, the portion of the Fund attributable to payments already made by USPS and its employees (including earnings on those payments), and "any other appropriate amount, as determined by [OPM] in accordance with generally accepted actuarial practices and principles." *Id.* § 2(c).

Read literally, the cost side of this provision could make USPS responsible for the cost of *all* CSRS benefits accrued by USPS employees—whether accrued while working for USPS, POD, or some other component of the federal government whose employees participated in CSRS. At the time the 2003 Act was adopted, as today, the word "service" meant "employment creditable under [5 U.S.C. §] 8332." 5 U.S.C. § 8331(12) (2000). And section 8332 provided that an employee's "service . . . shall be credited *from the date of original employment* to the date of separation on which title to annuity is based *in the civilian service of the Government.*" *Id.* § 8332(b) (Supp. III 2003) (emphasis added). To be sure, OPM has not adopted such a literalist reading, and the legislative history cuts strongly against reading the 2003 Act to work so drastic a change: As the

report from the Senate Committee on Governmental Affairs makes clear, the 2003 Act "*continue[d]* the Postal Service's liability for the retirement costs attributable to its employees covered by the CSRS, which was imposed when the [POD] became the self-supporting [USPS] in July 1971." S. Rep. No. 108-35, at 3 (emphasis added). But certainly, neither the text nor the legislative history supports USPS's position that the 2003 Act worked a drastic change in the opposite direction and permitted OPM to lift USPS's responsibility for costs attributable to post-1971 pay increases.

USPS does not rely solely on the cost side of the 2003 Act's Postal supplemental liability. Instead, USPS also focuses on the revenue-side provision requiring OPM, when calculating the Postal supplemental liability, to take into account "any other appropriate amount, as determined by [OPM] in accordance with generally accepted actuarial practices and principles." 5 U.S.C. § 8348(h)(1)(B)(iii). In USPS's view, this provision allows OPM to calculate the supplemental liability using "modern actuarial and accounting principles," USPS Letter at 11, and to change the method of attributing CSRS costs for former POD employees as between USPS and Treasury.

We disagree, as this revenue-side provision ill fits the purpose to which USPS would put it. To begin, the cost side, not the revenue side, governs the allocation of responsibility for benefits for former POD employees. In addition, the 2003 Act lifted this provision wholesale from the statutory scheme governing FERS. 2011 GAO Report at 29; *see* OPM Letter at 17–18. According to OPM, "[i]n calculating the supplemental liability under FERS since its enactment in 1986, OPM has interpreted the phrase 'any other appropriate amount' narrowly and uses it to apply to overdue payments." OPM Letter at 18. We do not think this revenue-side FERS transplant can plausibly be read to authorize OPM to change the basic allocation of CSRS costs as between USPS and Treasury. Congress generally does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Moreover, widening the lens to capture the 2003 Act's broader history makes clear that Congress did not intend to work a revolution in the basic allocation of responsibility. That history starts with the problem the Act

sought to solve. As we have explained, the Act grew out of GAO's request that OPM determine whether USPS "was paying more or less than appropriate to cover payments for [CSRS] for which it [was] responsible." H.R. Rep. No. 108-49, at 5. And when that analysis resulted in "good financial news" for USPS and showed an overfunding of more than $70 billion, OPM drafted legislation to correct that overfunding. 2002 James Letter at 1, 3; S. Rep. No. 108-35, at 2–3. No part of the problem Congress sought to solve concerned the allocation of benefit costs for USPS employees who worked at POD.

That history also includes—critically—how OPM calculated USPS's overfunding. OPM did so based on the same USPS/Treasury allocation that had endured since 1974: namely, USPS would continue to bear responsibility for all increases in CSRS benefits attributable to pay increases that USPS granted, including as to increases in benefits accrued for service at POD. *See* Methodology Report, *reprinted in Continuing to Deliver* at 262–63. Nor did this assumption simply lurk, undisclosed, in OPM's files. The Board, Treasury, and OMB all reviewed OPM's methodology and either "agreed with" or "concurred in" OPM's findings. 2002 James Letter at 2. And while GAO disagreed with OPM's assumptions in other respects, GAO—in analysis provided to Congress itself—did not question OPM's "methodologies for allocating estimated benefit payments and other expenses between service rendered before and after . . . the effective date of the Postal Reorganization Act." 2003 GAO Analysis at 53. Absent a clearer signal, we will not read the 2003 Act to have upended this shared understanding.

Finally, the relevant history encompasses the dollars-and-cents effects Congress anticipated the 2003 Act would yield. As we have explained, OPM estimated that the Act would save USPS between $2.5 and $2.9 billion a year, *see* 2002 James Letter at 2, or about $78 billion total, *see* Methodology Report, *reprinted in Continuing to Deliver* at 260; S. Rep. No. 108-35, at 2–3. CBO projected a similar magnitude: "$3 billion to $5 billion a year." S. Rep. No. 108-35, at 10. Yet under USPS's reading, the Act could have saved USPS—and thus cost Treasury—more than twice as much: an additional $110.8 billion (using the service ratio method) or $79.8 billion (on the benefit accrual method). *See* USPS-OIG, *Update on the Postal Service's Share of CSRS Pension Responsibility* at 1–7 (May 7, 2018); *cf.* S. Rep. No. 108-35, at 2–3. With the 2003 Act so focused on

USPS's finances, we are reluctant to adopt a reading that "would knock . . . entirely out of whack" the "public budgetary assumptions relied on by all actors during the enactment process." Abbe R. Gluck, *Congress, Statutory Interpretation, and the Failure of Formalism: The CBO Canon and Other Ways That Courts Can Improve on What They Are Already Trying to Do*, 84 U. Chi. L. Rev. 177, 189 (2017); *cf. Heckler v. Turner*, 470 U.S. 184, 206 (1985) ("hesitat[ing]" to adopt an interpretation at odds with Congress's "budgetary objectives . . . particularly when the information provided Congress by its own Budget Office, on which it presumably relied, belies that conclusion").

### 3.

The last key piece of legislation is the 2006 Act, which USPS claims granted OPM the discretion to revise the allocation methodology when it eliminated the matching-contribution provision of the 2003 Act that expressly made USPS responsible for costs stemming from "increases in rates of basic pay" granted by USPS. USPS Letter at 11.

Again, we do not agree that this change—to the first prong of the 2003 Act's two-prong system—changed the settled allocation of responsibility for costs attributable to USPS's pay increases. Instead, the change addressed a different issue entirely: USPS employees' military and volunteer service. As we have explained, Congress in 2006 reversed its 2003 decision to make USPS responsible for the CSRS costs attributable to that service. *See* H.R. Rep. No. 109-66, pt. 1, at 69. So Congress tweaked the second prong of its allocation system to peg the supplemental liability to the "present value of all future benefits payable" to current or former USPS employees "attributable to *civilian* employment" with USPS. 2006 Act § 802(a)(2) (emphasis added). And because that change resulted in an "immediate overfunding of [USPS's] portion of the CSRS Fund" of about $20.3 billion, H.R. Rep. No. 109-66, pt. 1, at 69, 82, Congress eliminated the matching-contribution requirement, *see* 2006 Act § 802(a)(1). Neither change, however, altered the basic allocation that had endured since 1974. Hence, after the 2006 Act as before, costs resulting from USPS-granted pay increases remained "attributable to" USPS.

Once more, the legislative history reinforces this conclusion. As we have explained, OPM put its position on this issue before Congress in a July 2003 report on the methodology it would use in calculating the 2003

Act's savings for USPS—a report that sparked an exchange of letters among OPM, USPS, and the CSRS Board of Actuaries. Methodology Report, *reprinted in Continuing to Deliver* at 262–63; *see supra* Part I.B.3. Then, witnesses at the hearings that yielded the 2006 Act complained about both the frozen benefit methodology and about forcing USPS to pay for costs related to military and volunteer service. *Supra* Part I.B.3. Yet Congress in the 2006 Act addressed only the second set of complaints. Nothing we have found in the Act's text or legislative history indicates that Congress understood the Act to permit a change in USPS's responsibility for the costs related to post-1971 pay raises. And again, the cost estimates confirm that Congress foresaw no such thing. Congress received OPM's and CBO's estimate that, thanks to the 2006 Act's changes to the CSRS funding methodology, USPS had already overfunded its CSRS obligations by about $20.3 billion. H.R. Rep. No. 109-66, pt. 1, at 82–83. But had the Act also relieved USPS of responsibility for post-1971 pay increases, by USPS's calculations, it could have yielded around an additional $86 billion for USPS. *See* 2004 Potter Letter at 2. We do not think the 2006 Act can reasonably be read to permit so stark a departure.

## B.

Post-2006 events confirm our conclusion. Congress has known about OPM's consistent interpretation for decades, since it enacted the 2003 and 2006 Acts. *Supra* Parts I.B.3 and I.C. And in the years since the 2006 Act, OPM's decision to use the frozen benefit methodology has come before Congress again and again—in a GAO report, Congressional Research Service reports, USPS-OIG reports, and at hearings. *See supra* Parts I.B.3 and I.C and note 6. Yet Congress has not enacted any of the 11 bills that, since 2010, members of Congress have introduced to prohibit OPM from using the frozen benefit methodology, including a House measure that attracted 230 co-sponsors. *See supra* Part I.C and note 7. And all the while, Congress has acted to relieve USPS of other obligations to address urgent concerns about USPS's financial health, including (in 2009 and 2022) reducing USPS's required contributions to the Postal Service Retiree Health Benefits Fund. *See* Pub. L. No. 111-68, div. B, § 164(a), 123 Stat. at 2053; Pub. L. No. 117-108, § 102(c)(1), 136 Stat. at 1139–40.

It is thus "hardly conceivable that Congress . . . was not abundantly aware of what was going on." *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983). Its failure to act thus "provides added support for concluding" that Congress has "acquiesced" in OPM's longstanding and consistent approach. *Id.* at 601. Moreover, even as Congress has repeatedly declined to adopt legislation that would have overridden OPM's allocation of responsibility for post-1971 pay increases, it has relieved USPS of certain other financial obligations. "Taken together, these actions by Congress" further "preclude" USPS's argument that OPM has discretion to revisit the matter. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155 (2000); *see id.* at 155–56 (distinguishing "simple inaction" that "purportedly represents [Congress's] acquiescence" from when Congress has "affirmatively acted to address" a problem by other means); *see also Legal Authority of the Department of the Treasury to Issue Regulations Indexing Capital Gains for Inflation*, 16 Op. O.L.C. 136, 155–56 (1992) (explaining that, where Congress has long been aware of an issue created by an agency's construction and addressed it through other means, it is a "particularly compelling case for concluding that Congress has ratified" the agency's interpretation).

### III.

We conclude that USPS is required to pay the full cost of CSRS benefits attributable to USPS's actions to increase its employees' pay since July 1, 1971, including with respect to increases in benefits accrued during those employees' years of service at POD.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*